I am authorized to say that ERICKSON, J., joins me in this dissent.

The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Richard Owen DRAKE, Defendant–Appellant.

No. 84SA34.

Supreme Court of Colorado, En Banc.

Jan. 11, 1988.

Rehearing Denied Feb. 8, 1988.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Robert M. Petrusak, and Clement P. Engle, Asst. Attys. Gen., Denver, for plaintiff-appellee.

Harmon & Griff, Maurice J. Harmon, Grand Junction, for defendant-appellant.

Massaro & Nugent, Nicholas R. Massaro, Grand Junction, and Haddon, Morgan & Foreman, P.C., Norman R. Mueller, Denver, for amici curiae American Civil Liberties Union and Colorado Criminal Defense Bar.

KIRSHBAUM, Justice.

Richard Owen Drake, the defendant, was found guilty by a jury of murder in the first degree, in violation of section 18–3–102, 8B C.R.S. (1986), in connection with the death of his wife, Regina Drake. After further proceedings, the trial court imposed a sentence of death pursuant to sec-

tion 16–11–103, 8A C.R.S. (1978 & 1983 Supp.). The defendant has appealed his conviction pursuant to section 16–11–103(7)(a) and C.A.R. 4(e), asserting that numerous errors were committed by the trial court in both the guilt-innocence phase and the sentencing phase of the trial. Although we agree that errors were committed in both phases of the trial, we nevertheless affirm the jury's guilty verdict. However, in view of the nature and extent of the errors affecting the sentencing phase of the trial proceeding, we reverse the sentence imposed by the trial court and order the imposition of the alternative sentence of life imprisonment.

## I. THE BASIC FACTS

The following summary of main events puts into an overall perspective the numerous legal issues presented by this appeal. Other pertinent facts will be discussed in the course of addressing those issues.

The defendant and his wife, Regina Drake, had four children during their marriage. The youngest child, a girl, was named Jennifer.

In July of 1982, the defendant purchased a life insurance policy in the face amount of $5,000. Regina was the named insured. The insurer advertised that it would pay all life insurance claims within twenty-four hours. On November 18, 1982, the defendant cancelled a $5,000 life insurance policy that he owned on his life and increased the coverage of the policy covering Regina to $10,000.

During the fall of 1982 the defendant proposed marriage to a co-worker at the bakery where he was employed. He indicated that he would divorce Regina if his proposal were accepted.

On November 24, 1982, Jennifer Drake suddenly died. Both the defendant and Regina experienced great difficulty adjusting to the loss of their daughter. The defendant at times also professed to be upset at what he characterized as Regina's inability to accept Jennifer's death.

In mid-December of 1982, the defendant telephoned his brother James, a resident of Shreveport, Louisiana, asked James to come to Colorado, and mailed him funds to purchase an airline ticket for the trip. James arrived in Grand Junction on December 14, 1982, and met with the defendant that evening. The defendant asked James to kill Regina in return for the anticipated $10,000 proceeds from the life insurance policy on her life. The defendant offered to provide James with a knife and keys to the apartment occupied by the defendant and his family. James agreed.

On December 16, 1982, the defendant left his apartment at about 3:45 a.m. and was driven to his job at the bakery by a friend. At 5:20 a.m., a Grand Junction Police Department operator received a telephone call, later established by police investigation to have been placed by James Drake, indicating that a woman had been stabbed at the defendant's residence. The call was tape recorded and traced to a public telephone located near a local department store. Police officers responding to the call discovered Regina's body, with numerous stab wounds, in the Drake apartment.

At about 6:00 a.m., police officers went to the bakery where the defendant was employed and informed him that Regina had been murdered. During the trial, Sergeant James Hall testified that the defendant immediately threw his helmet to the floor, put his face in his hands and uttered sobbing sounds when advised of his wife's death, but shed no tears. The defendant agreed to accompany the officers to the police station, where he was questioned.

Later that morning James Drake telephoned the defendant's apartment twice, asking to speak to the defendant. At approximately 2:00 that afternoon James Drake phoned the police station, identified himself, said he was calling long distance, and asked to speak to the defendant. The officer answering the call recognized the voice as that of the person who earlier had reported Regina's murder and suspected that the call originated locally. The de-

fendant initially denied that James was in Grand Junction, but subsequently informed the officers that James was staying at a local motel.

The officers went to the motel, found James and, with his consent, searched his room. That search and later investigation of the area near the motel resulted in the discovery of a ski mask, gloves, sales tags from the department store near the telephone booth from which the earlier morning call had been placed, airline boarding passes, a Schrade brand knife with blood stains on it and a matching sheath. James Drake was taken to the police station and was searched. During this search blood stains were found on his shirt, pants and belt and on the ski mask and gloves taken from his motel room.

The defendant was arrested later that day. On December 17, 1982, he was formally charged with murder in the first degree and a defense attorney was appointed to represent him. On February 8, 1983, the defendant tendered a plea of not guilty to the charge. The trial court declined to accept the plea, and no formal plea of not guilty was entered in the case.

On March 28, 1983, the defendant requested a meeting with the Mesa County District Attorney. Investigators Jack Rentfrow and G. Stone of the district attorney's office met briefly with the defendant, but refused to discuss the case unless the defendant waived his attorney's presence. On March 29, at the defendant's request, a second meeting was held with Rentfrow and Stone. The defendant was advised of his rights and signed a form waiving his attorney's presence. An audio tape was made of almost all of that interview, and the defendant signed a written statement that day.

In his March 29 statement the defendant said he arranged for his brother James to visit him in Grand Junction about the death of his daughter Jennifer; that at the meeting the defendant was informed that James had a "contract" to kill five people, including the defendant, Regina, or both, before

the end of the year; and that the defendant was told he should either go into business with James or suffer the consequences. The defendant said he told James to go ahead and kill Regina because, in view of her instability over the loss of their daughter, she would not be able to handle his death and he could better care for the remaining children. He stated that he agreed to leave the keys to his apartment in the mailbox in front of his home when he left for work on December 16 and that he gave James a knife. The defendant also stated that at 6:15 a.m. on December 16 he telephoned James and asked that he be killed instead of Regina, but that James said it was too late.

On April 1, the defendant requested another interview with Rentfrow and Stone. After he was given proper advisements, a reduction in the amount of defendant's bond was discussed, but the officials made no promises concerning that matter. The defendant said that he wanted to make another statement and tell the truth. He agreed that this statement could be recorded.

In his April 1 statement, the defendant stated that he called James and said he "needed someone out of the way," paid the cost of James' flight, and met with James on December 14 in Grand Junction. He told James the victim was to be Regina and agreed to pay James $10,000 from life insurance policy proceeds if James would kill Regina. The defendant said he made this arrangement because Regina could not handle Jennifer's death and because he wanted freedom. The defendant stated that on December 15 he and James finalized the plan; that he gave James a knife and left keys to the apartment in the mailbox; and that he did not ask James to abandon the plan.

At trial, which commenced December 5, 1983, the defendant objected to the participation of several prospective jurors on grounds of bias and prejudice. Many of the objections were denied. During the defense portion of the case, the defendant

called a clinical psychologist as an expert witness to establish that neither of the two statements made to the investigators was truthful. During the defendant's direct examination of the witness the trial court sustained an objection by the prosecutor to a question seeking to establish the basis of the expert's opinion by reference to discussions between the expert and the defendant. The trial court commented that the expert witness seemed "weird," and interrupted the direct testimony of the witness with comments critical of the defense attorney's performance. The trial court also denied the defendant's request to present testimony from another expert purportedly to the effect that a voice analysis indicated that the defendant's April 1 statement was not true.

After discussions between the defendant's attorney and the trial court, the defendant was advised in the presence of the jury of his right not to testify. He and his attorney indicated that he would nevertheless testify. The defendant told the jury that the April 1 statement was untrue and had been given in the hope of achieving his release from jail. He also testified that he did not participate in any way in Regina's murder.

The jury returned a verdict of guilty, and was then instructed by the trial court concerning the penalty phase of the case. After the introduction of further evidence by the prosecution and the defendant, the jury returned a verdict finding three aggravating factors and no mitigating factors. The trial court imposed a sentence to death, pursuant to section 16–11–103, 8A C.R.S. (1978 & 1983 Supp.), and this appeal followed.

## II. JURY SELECTION PROCEEDINGS

### A.

The defendant asserts that the trial court's denial of his challenges of certain prospective jurors for cause deprived him of his right to trial by a fair and impartial jury. Although the circumstances surrounding two of these challenges certainly would have supported different results, we conclude that there was no clear abuse of trial court discretion.

A defendant in a criminal proceeding has a fundamental right to a trial by jurors who are fair and impartial; to ensure that right is protected, the trial court must exclude prejudiced or biased persons from the jury. *E.g., People v. Abbott,* 690 P.2d 1263 (Colo.1984); *People v. Gurule,* 628 P.2d 99 (Colo.1981); *Nailor v. People,* 200 Colo. 30, 612 P.2d 79 (1980). The trial court must sustain a challenge for cause of a prospective juror if there exists a "state of mind in the juror evincing enmity or bias toward the defendant or the state." § 16–10–103(1)(j), 8A C.R.S. (1986). However, if the court is satisfied that the prospective juror will render an impartial verdict according to the law and the evidence admitted at trial, that person should not be disqualified. *Id.;* Crim.P. 24(b)(1)(X). Trial courts are afforded broad discretion in ruling on challenges for cause to prospective jurors, and decisions denying such challenges will be set aside only when a clear abuse of discretion is disclosed by the record. *Nunez v. People,* 737 P.2d 422 (Colo.1987); *People v. Sandoval,* 733 P.2d 319 (Colo.1987); *People v. Russo,* 713 P.2d 356 (Colo.1986); *People v. Wright,* 672 P.2d 518 (Colo.1983); *People v. Taggart,* 621 P.2d 1375 (Colo.1981). This standard recognizes that the trial judge is the only judicial officer able to perform the critical assessments by personal observation of the credibility and demeanor of a prospective juror. *E.g., People v. Sandoval,* 733 P.2d 319; *Nailor v. People,* 200 Colo. 30, 612 P.2d 79.

A prospective juror's expression of concern or indication of the presence of some preconceived belief as to some facet of the case does not automatically mandate exclusion of such person for cause. *E.g., People v. Sandoval,* 733 P.2d 319; *People v. Taggart,* 621 P.2d 1375; *People v.*

*McCrary,* 190 Colo. 538, 549 P.2d 1320 (1976). The test to be applied in determining whether a prospective juror should be dismissed for cause is whether the person would be able to set aside any bias or preconceived notion and render an impartial verdict based on the evidence adduced at trial and the instructions given by the court. *Nunez v. People,* 737 P.2d 422; *People v. Vigil,* 718 P.2d 496 (Colo.1986); *People v. Abbott,* 690 P.2d 1263. The trial court may consider a prospective juror's assurance that he or she can fairly and impartially serve on the case. *Nunez v. People,* 737 P.2d 422; *People v. Sandoval,* 733 P.2d 319; *People v. Russo,* 713 P.2d 356; *People v. Wright,* 672 P.2d 518.

■ Here, the defendant challenged three prospective jurors on the ground of bias. The first challenge involved a woman who stated that she was upset because the murder had occurred in the presence of children. This prospective juror gave conflicting statements respecting whether she would be able to follow the trial court's instructions in determining whether aggravating or mitigating circumstances were present. Although the defendant's challenge for cause might well have been sustained, we conclude that, in view of the wide latitude the trial court must be granted in its assessment of credibility and demeanor, its determination that she could set aside her beliefs and apply the court's instructions conscientiously does not constitute an abuse of discretion.

■ The defendant's second challenge for bias involved a woman who stated that although at the outset she had thought the defendant was guilty, she could set that opinion aside and decide the case on the evidence adduced at trial. The juror indicated that she felt she had reached a neutral position with respect to the defendant's case, but also stated that she had had a relationship with a man who had beaten her and that this personal history might possibly affect her decision-making. Again, we cannot conclude that, on balance, the trial court's refusal to exclude the juror for cause constituted a clear abuse of discretion.

■ The defendant's third challenge for cause based on bias involved a prospective juror who had talked with some of his co-workers concerning the case. He stated that he could not recall the particulars but that the talk had been "rough," that the defendant would not have a chance if he were judged by this group of workers, and that he "would sure hate to be in [the defense's] shoes." The prospective juror also stated, however, that he himself did not like to prejudge and that he would weigh the facts on their individual merits and follow the trial court's instructions. In view of these statements, the trial court's refusal to excuse this prospective juror for cause did not constitute a clear abuse of discretion.

### B.

During jury selection all prospective jurors who were unable to apply the death penalty in any case were excluded. The defendant argues that this practice violated his right under the sixth amendment to the United States Constitution to a fair and impartial jury. We are not persuaded by the defendant's argument.

■ Here, prospective jurors who indicated that they could not under any circumstances apply the death penalty were, at the request of the prosecutor, excluded for cause by the trial court at the voir dire stage of proceedings. The defendant, relying solely on *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985), asserts that such exclusion violated his right to an impartial jury by ensuring that the jury ultimately empanelled was unrepresentative of a cross-section of the community. However, *Grigsby v. Mabry* was reversed in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In *Lockhart,* the United States Supreme Court rejected the notion that petit juries must reflect the composition of the community at large and reaffirmed the long-standing rule that the fair cross-section requirement applies only to jury panels or venires. Moreover, the

Court observed that even if the fair cross-section requirement were extended to petit juries, the essence of a fair cross-section claim is the systematic exclusion of a "distinctive group," such as racial minorities or women, for reasons entirely unrelated to the ability of individuals within that group to perform the duties of juror in a particular case. *Lockhart v. McCree,* 476 U.S. at 174, 106 S.Ct. at 1765. Far from being impermissible, exclusion of prospective jurors solely on the basis that they are unable under any circumstances to impose the death penalty serves the state's legitimate interest in having a single jury that can consider the facts impartially and conscientiously apply the law in the case at both the guilt-innocence and sentencing phases of a capital trial. *Lockhart v. McCree,* 476 U.S. at 180, 106 S.Ct. at 1768 (citing *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell and Stevens, JJ.); *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984)).[1] We conclude that the defendant's sixth amendment right to trial by a fair and impartial jury was not infringed.

## III. THE DETERMINATION OF GUILT

The defendant argues that several evidentiary rulings of the trial court were erroneous and require reversal. He also asserts that the trial court improperly failed to recuse itself because of prejudice against the defendant, acted improperly in advising the defendant in the presence of the jury about the consequences of the defendant's decision to testify, and committed reversible error in failing to enter a formal plea of not guilty in the record of the case. While we conclude that errors were committed, we do not agree that either singly or cumulatively they require reversal of the jury's verdict of guilt.

### A.

■ The defendant contends that the trial court erred in sustaining an objection by the prosecutor to certain portions of the testimony of Dr. Michael Keown, a clinical psychologist called as an expert witness by the defendant. We agree, but conclude that the error was not sufficiently prejudicial to warrant reversal of the defendant's conviction.

At trial, the defendant argued that his brother, James Drake, at all times acted independently. Dr. Keown, who had examined the defendant, informed the jury that in his opinion the defendant's March 29 and April 1 statements to investigators Rentfrow and Stone were not reliable because

---

1. The defendant also argues that exclusion of all prospective jurors irrevocably opposed to the death penalty results in a "conviction-prone" jury. In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court rejected the argument that empirical studies have demonstrated that exclusion of such jurors results in a jury more likely to convict. The Court also indicated that, even assuming the existence of valid studies establishing that such juries are more likely to convict, the Constitution does not require a jury composed of a precise balance of jurors of various philosophical predispositions, but only a jury composed of individual jurors who indicate an ability to set aside any preconceptions they may have and decide the case based on the facts adduced at trial. As the Court stated:

 [I]f it were true that the Constitution required a certain mix of individual viewpoints on the jury, then trial judges would be required to undertake the Sisyphean task of "balancing" juries, making sure that each contains the proper number of Democrats and Republicans, young persons and old persons, white-collar executives and blue-collar laborers, and so on. Adopting McCree's concept of jury impartiality would also likely require the elimination of peremptory challenges, which are commonly used by both the State and the defendant to attempt to produce a jury favorable to the challenger.

 *Lockhart v. McCree,* 476 U.S. at 178–79, 106 S.Ct. at 1767 (1986).

 The defendant argues that the trial court improperly excluded several jurors for cause because of their views in opposition to the death penalty, thus denying him his right, guaranteed by the sixth and fourteenth amendments to the United States Constitution, to a fair and impartial jury at the sentencing phase of the trial proceeding. He also argues that the trial court improperly denied his challenges for cause respecting several jurors whom he characterizes as persons who would vote automatically for the death penalty. Because we reverse the defendant's death sentence on other grounds, we need not address these issues.

they were the product of a dependent-submissive personality and were designed simply to please his captors.[2] The defendant asked Dr. Keown to tell the jury what statements made to him by the defendant in the course of his interviews supported this opinion. The trial court sustained the prosecutor's objection as hearsay on the basis of CRE 801(c).

Contrary to the trial court's apparent conclusion, the statements made by the defendant to Dr. Keown were not offered into evidence to establish the truth thereof, but rather were offered to establish the basis for Dr. Keown's opinion that the defendant suffered from a dependent-submissive personality disorder. Thus, they did not constitute hearsay evidence under CRE 801(c). Dr. Keown's opinion that neither statement was reliable was consistent with the defendant's theory of the case, and the jury was entitled to evaluate the basis for that opinion. Thus, the trial court erred in sustaining the prosecutor's objection to this proposed testimony.

However, the defendant did not make an offer of proof to the trial court to establish for the record precisely what Dr. Keown would have said, had he been permitted to testify. In the absence thereof, we cannot estimate accurately what prejudice the defendant suffered from the trial court's erroneous ruling. The jury was informed of Dr. Keown's opinion. Furthermore, the defendant's own testimony supported the theory that neither of his two statements was believable. In view of these facts, and considering the weight of all the evidence indicating the defendant's guilt, we do not find the trial court's error sufficiently prejudicial to require reversal.

### B.

The defendant contends that the trial court erred in sustaining an objection by the prosecutor to proposed cross-examination by defense counsel of Carrie Buller, a prosecution witness who had worked with the defendant at the bakery. On direct examination, Buller testified that in late 1982 the defendant asked her to marry him, gave her a bracelet, and told her he intended to divorce Regina. On cross-examination, the defendant asked Buller if she had ever been convicted of an offense. The prosecutor objected, the jury was excused, and the prosecutor argued that although Buller had sustained a federal conviction, the offense was a misdemeanor rather than a felony, and therefore the fact of the conviction was not admissible for purposes of impeachment. The defendant's attorney, who had represented Buller in the federal court proceedings, argued that because the conviction was for fraudulent conduct it was admissible. Stating that "truthfulness is not an issue at this point," the trial court sustained the objection.

The trial court's comment was inaccurate; the truthfulness of any witness is always a potential issue at trial. It is generally true that the fact of a prior felony conviction is admissible as impeachment evidence, but that evidence of a prior misdemeanor conviction is not. § 13–90–101, 6A C.R.S. (1987); *People v. Robles*, 183 Colo. 4, 514 P.2d 630 (1973). In some situations, however, such as when a party seeks to establish that a witness habitually utters untrue statements, the circumstances surrounding a misdemeanor conviction may be disclosed to a jury. CRE 608(b) [3]; *see People v. Mejia*, 188 Colo. 120, 534 P.2d 779 (1975); *People v. Armstrong*, 704 P.2d 877 (Colo.App.1985).

Here, the defendant did not suggest that he wished to explore the circum-

---

**2.** The defendant also testified concerning his reasons for making those statements.

**3.** CRE 608(b) states as follows:

**Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in 13–90–101, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not oper-

stances surrounding Buller's federal conviction; he indicated only that he wished to inform the jury of the fact of the conviction. The defendant did not suggest that the fact of the conviction would controvert any specific testimony given by Buller—another recognized exception to the prohibition of admission of evidence of a misdemeanor conviction for general impeachment purposes. *See People v. Sasson,* 628 P.2d 120 (Colo.App.1980); *People v. Terranova,* 38 Colo.App. 476, 563 P.2d 363 (1976). Under these circumstances, the trial court did not abuse its discretion in sustaining the prosecution's objection to the defendant's question, although the trial court's stated reason for its ruling was inaccurate.

■ The defendant also argues on appeal that he was denied effective assistance of counsel, in violation of the sixth amendment to the United States Constitution, because his defense attorney's representation of Buller during her federal trial created a conflict of interest that improperly restricted his ability to cross-examine her concerning the circumstances of that conviction. We find no basis in the record to support the assumption that defendant's attorney did not fully explore the circumstances of Buller's conviction because of conflict of interest concerns. To the contrary, the public record of that conviction contained ample information to illustrate the circumstances thereof without resort to any information that might have been privileged. *See Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *United States v. Davis,* 766 F.2d 1452 (10th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985).

### C.

The defendant argues that the trial court erroneously sustained the prosecutor's objection to testimony of Dr. Henry Truby, a linguistics specialist familiar with voice-

print analysis. Although Dr. Truby had never examined the defendant, he had examined tape recordings of the defendant's March 29 and April 1 statements. The prosecutor objected to the admission of this testimony on the ground that the practice of voiceprint analysis constituted too speculative a field of inquiry to permit opinion testimony based thereon, and on the further ground that the testimony would not assist the jury. In response, the defendant made an offer of proof establishing that Dr. Truby would testify that, according to his analysis, the defendant's inflection, intonation, speech patterns and other characteristics, as revealed by the tape recordings, were substantially similar on both occasions; and that, therefore, either both statements were accurate or both statements were false, in direct contradiction to the prosecution's theory that the March 29 statement was false and the April 1 statement was true. The defendant intended to rely on Dr. Truby's testimony to corroborate the opinion of Dr. Keown that both statements were unreliable because they were simply products of the defendant's dependent-submissive personality syndrome. The trial court stated that Dr. Truby's opinion "would only confuse the jury and it would add nothing of a material relevance ... for all practical purposes."

The trial court's conclusion that Dr. Truby's testimony was not relevant to material issues in the case is incorrect. For purposes of admissibility, evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence" is material evidence. CRE 401. Dr. Truby's testimony was relevant to the defendant's position that neither of his statements was reliable.

■ At trial, however, the prosecutor argued in effect that the discipline of voice analysis is in its infancy and that Dr. Tru-

---

ate as a waiver of his privilege against self-incrimination when examined with respect to

matters which relate only to credibility.

by's field of expertise was not recognized as a sufficiently established discipline in the scientific community to permit the jury to consider his opinion testimony. The accuracy of voice analysis techniques has been challenged by several clinical studies. *See* A. Moenssens & F. Inbau, *Scientific Evidence in Criminal Cases*, 648–51 (2d ed. 1978). Many courts have refused to admit voice analysis evidence on the ground that voice analysis techniques contain the same inherent deficiencies that have led, in general, to rejection of polygraph test results as evidence in judicial proceedings. *See People v. Anderson*, 637 P.2d 354 (Colo.1981); *see also Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.*, 739 F.2d 1028 (5th Cir.1984); *United States v. Traficant*, 566 F.Supp. 1046 (N.D. Ohio 1983); *Neises v. Solomon State Bank*, 236 Kan. 767, 696 P.2d 372 (1985); *State v. Schouest*, 351 So.2d 462 (La.1977); *Smith v. State*, 31 Md.App. 106, 355 A.2d 527 (1976); *State v. Ochalla*, 285 N.W.2d 683 (Minn.1979); *People v. Tarsia*, 50 N.Y.2d 1, 427 N.Y.S.2d 944, 405 N.E.2d 188 (1980); *State v. Makerson*, 52 N.C.App. 149, 277 S.E.2d 869 (1981); *Sabag v. Continental South Dakota*, 374 N.W.2d 349 (S.D.1985); *but cf. Simon Neustadt Family Center, Inc. v. Bludworth*, 97 N.M. 500, 641 P.2d 531 (1982). We agree with this line of decisions. Therefore, in view of the prosecution's objection, the defendant's failure to establish that the technique used by Dr. Truby was sufficiently reliable to support his proposed opinions concerning the defendant's statements justified the trial court's decision to sustain the objection.

### D.

The defendant argues that the trial court erred in failing to excise certain portions of the tape recording of the April 1 statement; in admitting into evidence certain color slides used by the pathologist who performed the autopsy on Regina; and in failing to maintain a position of impartiality throughout the trial. He asserts these errors, singly or cumulatively, require reversal of his conviction. We disagree.

The defendant did not object at trial to the conduct here challenged. Therefore, this conduct will be viewed in light of the plain error standard. *Wilson v. People*, 743 P.2d 415 (Colo.1987); *People v. Barker*, 180 Colo. 28, 501 P.2d 1041 (1972); *see* Crim.P. 52(b).

A tape recording of the defendant's April 1 statement was played to the jury. The defendant asserts that references during the interview to other criminal conduct by the defendant and to whether he may have had any intent to kill his children, although not objected to at trial, should have been deleted from the tape under our decision in *Callis v. People*, 692 P.2d 1045 (Colo.1984).

In *McRae v. People*, 131 Colo. 305, 281 P.2d 153 (1955), this court concluded that when a statement made by a defendant is admitted in a criminal case the entire statement is admissible. In *Callis*, we rejected this rule, holding that evidence of prior criminality not otherwise relevant and admissible should not be introduced even though part of a defendant's otherwise admissible statement. *Callis*, however, was expressly made applicable only to cases filed after the effective date of that decision. Under the rule announced in *McRae*, which governed this trial, no error was committed.

This court has frequently noted that photographs relevant to issues in a criminal case are not rendered inadmissible because their content reveals grim details that might shock or otherwise upset the trier of fact. *People v. Mattas*, 645 P.2d 254 (Colo.1982); *People v. Steele*, 193 Colo. 87, 563 P.2d 6 (1977); *People v. Hosier*, 186 Colo. 116, 525 P.2d 1161 (1974). The color slides to which the defendant refers were relevant to the pathologist's opinions concerning the cause of Regina's death. The trial court did not commit plain error in admitting these slides into evidence in the absence of any objection thereto.

The defendant refers to several comments made by the trial judge during the course of the trial which, when coupled

with what the defendant asserts was frequent use of a snide and insinuating manner directed toward the defendant, defense counsel and defense witnesses, evidenced such prejudice and animosity against the defendant that the trial court should have voluntarily recused itself from these proceedings. Colorado Rule of Criminal Procedure 21(b)(2) provides that "[a]ny judge who knows of circumstances which disqualify him in a case shall, on his own motion, disqualify himself." [4]

 The parties in a criminal case are entitled to a trial presided over by a judge free of any bias, prejudice or interest directed toward any party or witness. A defendant asserting bias on the part of a trial judge must establish that the judge had a substantial bent of mind against him or her. *See People v. Botham*, 629 P.2d 589, 595 (Colo.1981); *Carr v. Barnes*, 196 Colo. 70, 74, 580 P.2d 803, 805 (1978). The record must establish such bias clearly; mere speculative statements and conclusions are insufficient to satisfy the burden of proof. *Carr v. Barnes*, 196 Colo. 70, 580 P.2d 803; *Walker v. People*, 126 Colo. 135, 248 P.2d 287 (1952).

The record in this case discloses several incidents in which the trial court made disparaging remarks to defense counsel concerning questions propounded to witnesses. When informed that the defendant's children were potential witnesses, the trial court stated, in the presence of the jury, "I seriously hope that Mr. Drake will seriously consider any further involvement of his children in this affair. However, I don't want to be understood as indicating what I think he ought to do in his own defense...." The trial court frequently interrupted the defendant's examination of witnesses, including the direct examination of a psychologist called by the defendant. When the defense counsel at one point attempted to clarify for the trial court a complex point regarding the basis of an expert witness' opinion concerning the defendant's asserted personality disorder, the trial court told the defense attorney, "You will listen to what he has to say and you will keep quiet." Additionally, when the prosecutor's objection to the proposed testimony of Dr. Truby, a voice analyst, was initially sustained, the trial court indicated that such testimony might be admissible depending upon the contents of the defendant's testimony, but then, after the defendant testified, again sustained the prosecution's objection to the testimony.

 It is not possible to capture from a reading of the record a full appreciation of intonations and gestures that may well significantly shape the effect of comments made by the trial court during a trial. When a trial attorney perceives conduct that appears to evidence bias, prejudice or interest, the attorney should of course state such perceptions on the record. The record in this case does reveal incidents of trial court comments to defense counsel that were rude, and some discussions with defense witnesses that evidenced irritation. Such comments and discussions should be avoided, especially when uttered in the presence of the jury. We cannot say, however, that the record as a whole establishes that bent of mind against the defendant or his attorney that warrants a finding of bias, prejudice or interest against the defendant. We therefore reject this argument. We are also satisfied that,

---

**4.** Colorado Rule of Criminal Procedure 21(b) governs proceedings when a defendant files a motion for substitution of a judge on the ground of prejudice or interest. At one point during discussions concerning the trial court's ruling rejecting the testimony of Dr. Truby, the voice analyst offered as a witness by the defendant, defense counsel made the following comment to the trial court:

I think you ought to disqualify yourself. I think you ought to get off this case and I think you ought to declare a mistrial and let us try this thing right.

The trial court declined to recuse itself from the case. On appeal, the defendant does not characterize this statement by defense counsel as a motion for disqualification pursuant to Crim.P. 21(b), and we do not so view it. *See Estep v. Hardeman*, 705 P.2d 523 (Colo.1985); *People v. Johnson*, 634 P.2d 407 (Colo.1981).

when viewed cumulatively and in light of the record as a whole, the errors that were made by the trial court in its conduct of the trial do not constitute plain error warranting reversal of the defendant's conviction.

### E.

The defendant asserts that the trial court failed to advise him properly of the consequences of any decision to testify at trial. He specifically claims that the trial court erred in conducting the advisement in the presence of the jury, in failing to warn the defendant that he could be cross-examined concerning prior convictions, in failing to inform the defendant that if he elected not to testify the jury could be informed of that election and in failing to state that any decision to testify or not to testify was a decision ultimately to be made by the defendant himself.

In *People v. Curtis*, 681 P.2d 504 (Colo.1984), we strongly recommended that any advisement of the right not to testify should be performed outside the presence of the jury. Because it is not possible to predict what questions, explanations and discussions might occur during such an advisement, there is inherent danger of prejudice to the defendant in permitting the jury to be present. Furthermore, it is also extremely difficult to measure the extent of any prejudice occurring in such circumstances. We again strongly caution that any such advisement should be conducted outside the presence of the jury.

While there is always a danger that a defendant might feel coerced into testifying when the trial court's advisement of the right to remain silent is conducted in the presence of the jury, nothing in this record indicates such factor is present in this case. In view of the defendant's decision to testify, and considering the weight of the evidence establishing his guilt, we find the trial court's error to be harmless beyond a reasonable doubt. *See* Crim.P. 52(a).

In any case challenging the validity of a waiver of the right not to testify, the reviewing court must determine whether the defendant in fact knowingly and intelligently waived this fundamental right. *People v. Mozee*, 723 P.2d 117 (Colo.1986); *Reed v. People*, 171 Colo. 421, 467 P.2d 809 (1970). In *Mozee*, we observed that an advisement of the nature and consequences of the right to testify to a defendant who chooses not to testify differs materially from an advisement of the right to remain silent to a defendant who elects to testify. We noted that defense counsel has a responsibility to advise the defendant of matters associated with the right to remain silent, and that on several occasions between arrest and trial the defendant is apprised of this fundamental right by law enforcement and judicial officials. In this case, the defendant stated that he had been advised of his right not to testify by his attorney. The defendant's trial counsel also indicated on the record that he as well as the trial court had made inquiries of the defendant prior to the formal advisement now challenged. In view of these circumstances, we conclude that the defendant's waiver of the right to remain silent was effective.

### F.

The defendant contends that the trial court erred in failing to insist *sua sponte* upon the entry of a formal not guilty plea and in failing to *sua sponte* take steps to mitigate the effect of an allegedly improper question asked by the prosecutor during the cross-examination of the defendant. We do not agree.

#### 1.

When the defendant initially tendered a plea of not guilty on February 8, 1983, the trial court rejected the plea pending determination of several motions the defendant filed. The plea was not tendered again and, without objection, no formal plea of not guilty was ever entered in the case.

Section 16–7–208, 8A C.R.S. (1987), provides that if no plea is entered in a criminal case, "the case shall for all pur-

poses be considered as one in which a plea of not guilty has been entered." Similarly, section 16–7–203, 8A C.R.S. (1987), provides that irregularities in an arraignment not affecting substantial rights of a defendant and not objected to shall not "affect the validity of any proceeding in the cause." These statutes, while recognizing fully a defendant's right to respond in whatever manner the defendant elects to any criminal charge, are designed to ensure that convictions may not be overturned because of irregularities in arraignment proceedings. Here, there was never any question about the defendant's position, stated on the record on February 8, 1983, and never altered, that he was not guilty of the charged offense. In view of the purpose of these statutory provisions and the lack of any prejudice to the defendant from this procedural irregularity, we find no basis for reversal of the defendant's conviction in this unusual circumstance. *See Landford v. People*, 148 Colo. 300, 365 P.2d 893 (1961), *cert. denied*, 369 U.S. 862, 82 S.Ct. 953, 8 L.Ed.2d 20 (1962).

### 2.

During cross-examination of the defendant by the prosecutor, in response to a prosecutor's question about any prior felony conviction, the defendant said he had been convicted of two felonies. When the prosecutor asked, "What are they?", the defendant said one was for extortion and one was for burglary. No objection was interposed to the prosecutor's question. However, defense counsel later informed the trial court that the extortion case had in fact been a juvenile proceeding; no further reference was made by the prosecutor to the extortion matter. The defendant now urges reversal because of the prosecutor's question, apparently on the theory that the trial court had some duty to take some step once the issue had been raised.

▮ The credibility of a defendant who testifies in a criminal case is subject to impeachment by good faith reference by the prosecutor to prior felony convictions.

*People v. Thompson*, 182 Colo. 198, 200, 511 P.2d 909, 910 (1973). However, a juvenile proceeding is not a criminal proceeding, and a prior adjudication of delinquency cannot be used for such impeachment purposes. *See People v. Apodaca*, 668 P.2d 941 (Colo.App.1982), *aff'd in part, rev'd on other grounds*, 712 P.2d 467 (Colo.1985). In the absence of an objection, a lack of good faith will not be presumed on appeal, and a defendant seeking to reverse a conviction because of improper prosecutorial inquiry into prior criminal conduct must demonstrate prejudice. *People v. Ciari*, 189 Colo. 325, 328–29, 540 P.2d 1094, 1097 (1975); *People v. Lewis*, 180 Colo. 423, 426–27, 506 P.2d 125, 126–27 (1973). The record here does not support the defendant's assertion that, in light of the prosecutor's knowledge of the defendant's criminal record, the question "What are they?" was proposed in bad faith. Nor does the record suggest that the defendant's isolated voluntary reference to this juvenile adjudication resulted in substantial prejudice to him. In the absence of any request by the defendant, the trial court had no duty to comment on this issue to the jury. We, therefore, reject this argument.

### IV. SPEEDY TRIAL

The defendant argues that his right to speedy trial, as established by section 18–1–405, 8B C.R.S. (1986), and Crim.P. 48(b), was denied in this case. Acknowledging that he at no time requested the trial court to dismiss the case on lack of speedy trial grounds, he argues that his silence should not be deemed a waiver of the right. He further contends that the failure of the trial court to enter a formal plea of not guilty during the trial makes calculation of the date from which the speedy trial period began to run impossible and excuses his failure to assert any objection. The argument is without merit.

▮ Section 18–1–405(5), 8 C.R.S. (1978), in effect during the trial, contained the following pertinent provisions:

To be entitled to a dismissal under subsection (1) of this section, the defendant must move for dismissal prior to the commencement of his trial.... Failure to so move is a waiver of the defendant's rights under this section.

This language, as well as the almost identical language of Crim.P. 48(b)(5), specifically provides that the failure to move for dismissal prior to the beginning of the trial is itself a waiver of the statutory right. We have previously noted that the trial court's failure to enter a formal not guilty plea must be treated as if such plea had been entered. Certainly the date from which the defendant's right to speedy trial began to run in this case could be fixed no earlier than February 8, 1983. Whatever date might be selected as initiating the speedy trial period, the defendant's failure to timely assert some objection to the proceeding based on speedy trial considerations constituted a waiver of that right.

**5.** Section 16–11–103, 8 C.R.S. (1978 & 1983 Supp.), provides:

**Imposition of sentence in class 1 felonies.** (1) Upon conviction of guilt of a defendant of a class 1 felony, the trial court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment. The hearing shall be conducted by the trial judge before the trial jury as soon as practicable. If a trial jury was waived or if the defendant pleaded guilty, the hearing shall be conducted before the trial judge.

(2) In the sentencing hearing any information relevant to any of the aggravating or mitigating factors set forth in subsection (5), (5.1), or (6) of this section may be presented by either the people or the defendant, subject to the rules governing admission of evidence at criminal trials; except that, in the proof of mitigating factors set forth in subsections (5) and (5.1) of this section, the rules of evidence shall not apply. The court, in its discretion, may act to deny the admission of evidence that is repetitive. The people and the defendant shall be permitted to rebut any evidence received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the evidence to establish the existence of any of the factors set forth in subsection (5), (5.1), or (6) of this section. Nothing in this subsection (2) shall be construed to authorize the introduction of any evidence obtained in violation of the constitution of this state or the constitution of the United States.

## V. SENTENCING PROCEEDINGS

 The defendant contends that the death sentence imposed by the trial court must be reversed due to the trial court's failure to instruct the jury in unambiguous terms that the jury's verdicts with respect to the presence or absence of mitigating and aggravating factors would be the sole determinants of whether the defendant would be sentenced to life imprisonment or to death. We agree.

Pursuant to the sentencing statute applicable to this case, section 16–11–103, 8 C.R. S. (1978 & 1983 Supp.), when a jury verdict of guilty is returned in a class 1 felony case, the trial court must conduct a sentencing hearing to determine whether the defendant should be sentenced to life imprisonment or to death.[5] Under this provision, the jury that determined the defendant's guilt must also return special verdicts concerning the presence or absence of stat-

(3) After hearing all the evidence, the jury shall deliberate and render a verdict, or if there is no jury the judge shall make a finding as to the existence or nonexistence of each of the factors set forth in subsections (5), (5.1), and (6) of this section. The existence of an aggravating factor shall be proved by the prosecution beyond a reasonable doubt.

(4) If the sentencing hearing results in a verdict or finding that none of the factors set forth in subsection (5) of this section exist and that one or more of the factors set forth in subsection (6) of this section do exist, the court shall sentence the defendant to death, unless the verdict or finding is that sufficient mitigating factors have been presented pursuant to subsection (5.1) of this section to justify a sentence of life imprisonment rather than death. In the event the verdict or finding is based on mitigating evidence introduced pursuant to subsection (5.1) of this section, the trier of fact shall set forth in writing the mitigating factor or factors which were regarded as sufficient to justify a sentence of life imprisonment rather than death. If the sentencing hearing results in a verdict or finding that none of the aggravating factors set forth in subsection (6) of this section exist or that one or more of the mitigating factors set forth in subsection (5) of this section do exist or that evidence adduced pursuant to subsection (5.1) of this section justifies the imposition of a sentence of life imprisonment rather than death, the court shall sentence the defendant to life imprisonment. If the sentencing hearing is before a jury and the verdict is not unanimous, the jury shall be discharged,

and the court shall sentence the defendant to life imprisonment.

(5) The court shall not impose the sentence of death on the defendant if the sentencing hearing results in a verdict or finding that at the time of the offense:

(a) He was under the age of eighteen; or

(b) His capacity to appreciate wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution; or

(c) He was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution; or

(d) He was a principal in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution; or

(e) He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person.

(5.1) In addition to the mitigating factors set forth in subsection (5) of this section, the trier of fact shall hear any other factors bearing on the question of mitigation. Such factors include, but are not limited to, the following:

(a) The emotional state of the defendant at the time the crime was committed;

(b) The absence of any significant prior conviction;

(c) The extent of the defendant's cooperation with law enforcement officers or agencies and with the office of the prosecuting district attorney;

(d) The influence of drugs or alcohol;

(e) The good faith, although mistaken, belief by the defendant that circumstances existed which constituted a moral justification for the defendant's conduct;

(f) The age of the defendant at the time of commission of the crime;

(g) The defendant is not a continuing threat to society; or

(h) Any other evidence which in the court's opinion bears on the question of mitigation.

(6) If no factor set forth in subsection (5) of this section is present or if the trier of fact does not regard as sufficient any other mitigating factor or factors as justifying a sentence of life imprisonment, the court shall sentence the defendant to death if the sentencing hearing results in a verdict or finding that:

(a) The defendant has previously been convicted by a court of this or any other state, or of the United States, of an offense for which a sentence of life imprisonment or death was imposed under the laws of this state or could have been imposed under the laws of this state if such offense had occurred within this state; or

(b) He killed his intended victim or another, at any place within or without the confines of a penal or correctional institution, and such killing occurred subsequent to his conviction of a class 1, 2, or 3 felony and while serving a sentence imposed upon him pursuant thereto; or

(c) He intentionally killed a person he knew to be a peace officer, fireman, or correctional official. The term "peace officer" as used in this section means only a regularly appointed police officer of a city, marshal of a town, sheriff, undersheriff, or deputy sheriff of a county, state patrol officer, or agent of the Colorado bureau of investigation; or

(d) He intentionally killed a person kidnapped or being held as a hostage by him or by anyone associated with him; or

(e) He has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; or

(f) He committed the offense while lying in wait, from ambush, or by use of an explosive or incendiary device. As used in this paragraph (f), explosive or incendiary device means:

(I) Dynamite and all other forms of high explosives;

(II) Any explosive bomb, grenade, missile, or similar device; or

(III) Any incendiary bomb or grenade, fire bomb, or similar device, including any device which consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and can be carried or thrown by one individual acting alone; or

(g) He committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants; or

(h) In the commission of the offense, he knowingly created a grave risk of death to another person in addition to the victim of the offense; or

(i) He committed the offense in an especially heinous, cruel, or depraved manner.

(7)(a) Whenever a sentence of death is imposed upon a person pursuant to the provisions of this section, the supreme court shall review the propriety of that sentence, having regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based. The procedures to be employed in the review shall be as provided by supreme court rule.

(b) A sentence of death shall not be imposed pursuant to this section if the supreme court determines that the sentence was imposed under the influence of passion or prejudice or any other arbitrary factor or that the evidence presented does not support the finding of statutory aggravating circumstances.

utorily defined mitigating, additional mitigating and aggravating factors regarding the offender and the circumstances surrounding the offense. If the jury finds the presence of one or more mitigating or additional mitigating factors, or finds the absence of aggravating factors, the trial court must sentence the defendant to life imprisonment. If the jury finds an absence of any mitigating or additional mitigating factors and also finds the presence of at least one aggravating factor, the court must sentence the defendant to death.

In *People v. Durre*, 690 P.2d 165 (Colo. 1984), this court concluded that under the provisions of section 16–11–103, 8 C.R.S. (1978 & 1983 Supp.), a death sentence imposed by a trial court must be reversed where the jury that returned verdicts on mitigating and aggravating circumstances was not adequately informed of the effect of such verdicts on the ultimate question of life imprisonment or death. Although the trial court in *Durre* orally advised the jurors at the outset of the sentencing hearing that their decision as to the existence of mitigating and aggravating factors would "determine what penalty should be imposed," the trial court did not inform the jurors of the effect of their verdicts on the life or death of the defendant. *Id.* at 174 n. 15. We recognized that a verdict form which required the jury to determine whether there were additional mitigating factors sufficient to justify life imprisonment might well be interpreted as merely vesting the jury with an advisory role, with the trial court retaining discretion respecting the imposition of penalty. *People v. Durre*, 690 P.2d at 174. We held:

> [I]n order to eliminate any uncertainty on the part of jurors regarding the effect of their verdicts on the issue of punishment, trial courts at the conclusion of the evidentiary stage of a capital sentencing hearing must inform the jury by an appropriate instruction that verdicts of no mitigating and no additional mitigating circumstances and a verdict of one or more aggravating circumstances necessarily require the imposition of a death

sentence; that a verdict of mitigating or additional mitigating circumstances, or a verdict of no aggravating circumstances, necessarily requires the imposition of a sentence to life imprisonment; and that under no circumstances does the court have any discretion on the matter of penalty.

*People v. Durre*, 690 P.2d at 174 (footnote omitted).

We acknowledged in *Durre* the well established requirements that a criminal jury must express its decision in terms devoid of ambiguity, *People v. Durre*, 690 P.2d at 173 (citing *Yeager v. People*, 170 Colo. 405, 462 P.2d 487 (1969)), and that a criminal verdict must "convey beyond a reasonable doubt the meaning and intention of the jury," *People v. Durre*, 690 P.2d at 173 (quoting *Yeager v. People*, 170 Colo. at 410, 462 P.2d at 489, and citing *Kreiser v. People*, 199 Colo. 20, 604 P.2d 27 (1979); *Johnson v. People*, 174 Colo. 75, 482 P.2d 105 (1971)). Our holding was grounded firmly upon the need to ensure certainty and reliability in a criminal verdict, a need implicit in the reasonable doubt standard, and upon the enhanced need for certainty and reliability in imposing the appropriate punishment in a capital case, requiring careful scrutiny by virtue of the unique severity and irrevocability of the permissible punishment. *People v. Durre*, 690 P.2d at 173 (citing *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed. 2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion)). We noted as well that the General Assembly, by mandating unanimity in jury verdicts, had recognized the need for certainty and reliability in the jury's decision in criminal trials in general and in capital sentencing verdicts in particular. *People v. Durre*, 690 P.2d at 173 (citing § 16–11–103(4), 8 C.R.S. (1978 & 1983 Supp.)).

In this case, the trial court gave no advisement respecting the jury's role at the commencement of the sentencing hearing. At the conclusion of the sentencing hearing the trial court gave the following critical instructions to the jury:

### INSTRUCTION NO. 2

The Defendant in this case has been found guilty of the offense of murder in the first degree. It is now your duty to make a finding of whether mitigating circumstances exist and if not, whether aggravating circumstances have been proven beyond a reasonable doubt. In arriving at this determination, you should consider all of the evidence presented at the trial and sentencing hearing.

In determining if mitigating factors exist, consider the following:

(1) The Defendant was under the age of eighteen; or

(2) His capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution; or,

(3) He was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution; or

(4) He was a principal in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution; or,

(5) He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person;

(6) Additionally, you may consider the following: the emotional state of the Defendant at the time the crime was committed; the absence of any significant prior convictions; the extent of the Defendant's cooperation with law enforcement officers or agencies and with the office of the prosecuting district attorney; the influence of drugs or alcohol; the good faith, although mistaken, belief by the Defendant that circumstances existed which constituted a moral justification for the Defendant's conduct; the age of the Defendant at the time of the commission of the crime; and whether any other relevant evidence bearing on the question of mitigation exists to justify the sentence of life imprisonment.

Should you find, however, that none of the above mitigating factors exist, you shall determine if the People have proven any aggravating factor beyond a reasonable doubt. Therefore, consider if:

(1) The Defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; or

(2) In the commission of the offense, the Defendant knowingly created a grave risk of death to another person in addition to the victim of the offense; or

(3) He committed the offense in an especially heinous, cruel or depraved manner.

. . . .

### INSTRUCTON NO. 4

You are instructed that you do not necessarily have to find the existence of either mitigating or aggravating circumstances in this case, and if you so determine, the foreman should sign the verdict form without checking any of the boxes.

These instructions, substantially similar to those given in *Durre*, did not inform the jury that the decision respecting aggravating and mitigating circumstances necessarily determined whether the penalty imposed would be life imprisonment or death. While Instruction No. 2 advised the jury to consider whether there was evidence of additional mitigating factors to justify a sentence of life imprisonment, it failed to inform the jury of the effect of its verdicts.

Like the instructions in *Durre*, these directions tended to obscure the fact that, unlike other sentencing procedures under the Colorado Criminal Code, the jury and only the jury had the authority and responsibility to determine which of two possible sentences would be imposed upon the defendant.

The verdict form submitted to the jury, similar to that submitted in *Durre*, stated as follows:

We, the Jury, having considered all of the evidence, find the existence of one or more of the following mitigating factors:

( ) A. The Defendant was under the age of eighteen; or

( ) B. His capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution; or,

( ) C. He was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution; or

( ) D. He was a principal in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution; or,

( ) E. He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person.

IF YOU CHECK ANY OF THE FOREGOING, YOU NEED NOT PROCEED FURTHER, BUT IF NONE OF THE BOXES ARE CHECKED, YOU MUST PROCEED TO THE FOLLOWING SET OF CIRCUMSTANCES. YOU NEED NOT CHECK ANY OF THE FOLLOWING BOXES, BUT IF YOU FIND ONE OR MORE OF THE FOLLOWING CIRCUMSTANCES, THE APPROPRIATE BOX SHOULD BE CHECKED.

We, the Jury, having considered all of the evidence, find one or more aggravating factors:

( ) A. The Defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; or,

( ) B. In the commission of the offense, the Defendant knowingly created a grave risk of death to another person in addition to the victim of the offense; or

( ) C. The Defendant committed the offense in an especially heinous, cruel or depraved manner.

IF YOU CHECK ANY OF THE ABOVE AGGRAVATING FACTORS, YOU MUST PROCEED TO CONSIDER ANY OTHER MITIGATING FACTORS. YOU MAY CONSIDER ANY FACT INCLUDING BUT NOT LIMITED TO THE FOLLOWING, IN DECIDING WHETHER A SENTENCE OF LIFE IMPRISONMENT RATHER THAN DEATH IS JUSTIFIED:

We, the Jury, having considered all of the evidence, find one or more mitigating factors justifies the sentence of life imprisonment rather than death:

( ) A. The emotional state of the Defendant at the time the crime was committed;

( ) B. The absence of any significant prior conviction of the Defendant;

( ) C. The extent of the Defendant's cooperation with law enforcement officers or agencies, and with the office of the prosecuting district attorney;

( ) D. The influence of alcohol or drugs;

( ) E. The good faith, though mistaken belief by the Defendant that circumstances existed which constituted a moral justification for the Defendant's conduct;

( ) F. The age of the Defendant at the time of the commission of the crime;

( ) G. The Defendant is not a continuing threat to society;

( ) H. Any other factor which bears on the question of mitigation.

The jury here found none of the first set of mitigating factors present, found all three

of the aggravating factors present and found present none of the additional mitigating factors which might justify a sentence of life imprisonment. The verdict form, however, did not advise the jury that its verdicts constituted more than a mere recommendation in sentencing with discretion in the trial court to accept the jury's conclusion. In so critical an area, the instructions and verdict forms must inform the jury of its ultimate role in unambiguous terms.

█ Section 16-11-103 reposes no discretion in the trial court respecting the imposition of sentence.[6] *People v. Durre,* 690 P.2d at 171. While there is no constitutional right to sentencing by a jury in a capital proceeding, *Spaziano v. Florida,* 468 U.S. 447, 457-65, 104 S.Ct. 3154, 3160-64, 82 L.Ed.2d 340 (1984), the sentencing authority, whether it be judge or jury, must at a minimum weigh any aggravating and mitigating factors present and consciously decide whether, in light of those factors, a sentence of death is the appropriate sentence for that particular offender,

see, e.g., id.; *Zant v. Stephens,* 462 U.S. 862, 890, 103 S.Ct. 2733, 2749, 77 L.Ed.2d 235; *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1; *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (plurality opinion); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (plurality opinion). Because the sentencing authority, in this case the jury, was not clearly and unambiguously apprised by any instructions or by jury verdict forms of its role as the sole arbiter of whether a sentence of death should be imposed upon the defendant, we find inescapable the conclusion that doubt or speculation exists as to whether "death is the appropriate punishment in [this] specific case." *Woodson v. North Carolina,* 428 U.S. at 305, 96 S.Ct. at 2991 (plurality opinion). *See also State v. Ramseur,* 106 N.J. 123, 524 A.2d 188 (1987) (death sentence reversed where trial

---

**6.** The General Assembly amended § 16-11-103 in 1984. The amended version, applicable to offenses committed on or after July 1, 1984, *see* Act approved April 12, 1984, ch. 120, § 7, 1984 Colo.Sess.Laws 491, 495, unequivocally delineates the roles of the jury and the trial court as follows:

(2)(a) After hearing all the evidence and arguments of the prosecuting attorney and the defendant, the jury shall deliberate and render a verdict based upon the following considerations:

(I) Whether at least one aggravating factor has been proved as enumerated in subsection (6) of this section;

(II) Whether sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist; and

(III) Based on the considerations in subparagraphs (I) and (II) of this paragraph (a), whether the defendant should be sentenced to death or life imprisonment.

(b)(I) In the event that no aggravating factors are found to exist as enumerated in subsection (6) of this section, the jury shall render a verdict of life imprisonment, and the court shall sentence the defendant to life imprisonment.

(II) The jury shall not render a verdict of death unless it finds and specifies in writing that:

(A) At least one aggravating factor has been proved; and

(B) There are insufficient mitigating factors to outweigh the aggravating factor or factors that were proved.

(c) In the event that the jury's verdict is to sentence to death, such verdict shall be unanimous and shall be binding upon the court unless the court determines, and sets forth in writing the basis and reasons for such determination, that the verdict of the jury is clearly erroneous as contrary to the weight of the evidence, in which case the court shall sentence the defendant to life imprisonment.

(d) If the jury's verdict is not unanimous, the jury shall be discharged, and the court shall sentence the defendant to life imprisonment.

(3) In all cases where the sentencing hearing is held before the court alone, the court shall determine whether the defendant should be sentenced to death or life imprisonment in the same manner in which a jury determines its verdict under paragraphs (a) and (b) of subsection (2) of this section. The sentence of the court shall be supported by specific written findings of fact based upon the circumstances as set forth in subsections (5) and (6) of this section and upon the records of the trial and the sentencing hearing.

§ 16-11-103, 8A C.R.S. (1986).

court's instructions may have left jury with impression it was not responsible for deciding defendant's sentence).

Relying on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the defendant also argues that certain comments made by the prosecutor so diminished the jury's sense of responsibility that reversal of his death sentence is mandated. In *Caldwell*, defense counsel, in closing argument at a capital sentencing proceeding, asked the jury to show mercy and emphasized the gravity and awesomeness of the jury's responsibility in deciding whether to impose a death sentence. In response, the prosecutor argued, "Now, [the attorneys for the defense] would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it." Overruling an objection by defense counsel, the trial court stated, "I think it proper that the jury realize that it is reviewable automatically as the death penalty commands." The prosecutor then added, "[T]he decision you render is automatically reviewable by the Supreme Court." The United States Supreme Court vacated the death sentence, holding that the need for reliability in the imposition of a death sentence mandated the conclusion that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. at 328–30, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231.

■ Here, the prosecutor made the following comments during closing argument at the sentencing proceeding:

I just would remind you that it is a shared responsibility that you have. This does not just fly out of anywhere and you suddenly have to decide that

without any guidelines as to what to do and what not to do. This is a law that was passed here in our state and this case has come up through the system and has been looked at and obviously it has gone through this Court. You have made a determination of guilty and now at this particular stage of the proceedings, you are to make a factual determination based on the evidence here and where it goes from there, I will not elaborate. I am not trying to minimize the responsibility that you have but I would remind you that it is a shared responsibility and that is our law here in the State of Colorado.

. . . .

Now, [defense counsel] has told you that the death penalty is final. Indeed it is but what happened to Regina is also final. There is no coming back from that. There is no appeal from that.

. . . .

I would again like to remind you that what you have is a shared responsibility. This is the law in our state that was passed. You are not alone. This case would not be here but for the actions of the police and it would not be here but for the actions of the prosecution and we are asking for this in your findings of fact and as you were told during the voir dire, you do not directly administer this. That job goes to the Court and you are part of the process and don't let anybody use your decency against you to say that you did it, but who did it?

These comments are, of course, susceptible of several interpretations. Thus, it is highly likely that these remarks injected an element of confusion for the jury. Without clarification from the trial court, they may well have resulted in a diminution of the jury's sense of responsibility for the ultimate imposition of sentence at the critical stage in the proceedings when consideration of the appropriate punishment was the task immediately at hand.[7] *E.g. People v.*

---

7. In *People v. District Court*, 190 Colo. 342, 546 P.2d 1268 (1976), this court concluded that in a

capital case prospective jurors could be questioned on voir dire regarding their views on

*Perez,* 108 Ill.2d 70, 90 Ill.Dec. 932, 483 N.E.2d 250 (1985) (although trial judge and prosecutor mentioned that jury would "recommend" whether to impose death penalty, no reversible error where trial judge properly instructed jury that the court had no discretion regarding sentencing), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 931 (1986); *State v. Clark,* 492 So.2d 862 (La.1986) (death sentence set aside because of prosecutor's lengthy reference to automatic appellate review of death sentences); *Commonwealth v. Baker,* 511 Pa. 1, 511 A.2d 777 (1986) (death sentence reversed where prosecutor's comments during penalty phase concerning "appeal after appeal after appeal" tended to minimize jury's sense of responsibility); *State v. South,* 285 S.C. 529, 331 S.E.2d 775 (death sentence upheld on the basis that trial court's instructions and defense counsel's arguments adequately dealt with prosecutor's improper comment that there were safeguards in the system which he

could not discuss), *cert. denied,* 474 U.S. 888, 106 S.Ct. 209, 88 L.Ed.2d 178 (1985); *see also Frye v. Commonwealth,* 231 Va. 370, 345 S.E.2d 267 (1986) (comments of prosecutor and trial judge that jury's verdict was mere recommendation required reversal of death sentence where statute referred to jury's verdict as a recommendation but also provided that only upon good cause shown could trial court set aside a jury verdict of death and impose lesser penalty of life imprisonment). We must conclude that such comments, by implying that the jury had only an indirect or advisory role rather than the ultimate role in the imposition of sentence, were improper and, although not dispositive, constitute an additional factor casting doubt upon the reliability of the sentence in this case.[8] In view of all these circumstances, the absence of unambiguous instructions and adequate verdict forms clearly advising the jury of its absolute responsibility in determining the sentence to be imposed requires rever-

---

capital punishment. This court also approved the following ante-voir dire instruction:

> In the event that the defendant is found guilty as charged in [description of charge in information or indictment], there will follow a second hearing before the same jury. Evidence may be introduced at this hearing. At the conclusion of the hearing certain questions will be submitted to the jury to take to the jury room for deliberation and response. After these questions have been answered and, depending upon the answers as prescribed by law, the judge will sentence the defendant either to life imprisonment or death.
>
> The sentence of the judge will be dependent upon the answers of the jury and, while the jury may not be fully advised as to the effect of any particular answer or group of answers, the People and the defendant have the right to examine you as prospective jurors within appropriate limits as to your views on capital punishment.

*People v. District Court,* 190 Colo. at 346, 546 P.2d at 1271. Here, the trial court's ante-voir dire instructions comported with those approved in *People v. District Court.* The trial court also made numerous comments during the voir dire proceedings to the effect that the jury would be indirectly involved in sentencing and would only answer certain questions but would not actually impose the death penalty. The defendant urges that these statements of the trial court impermissibly diminished the jury's sense of responsibility in sentencing. Because

we conclude that the formal instructions and verdict forms created impermissible ambiguities at the critical sentencing phase of the trial, we need not determine this issue in this case. To the extent that the trial court's comments during the voir dire proceedings introduced additional ambiguity at the outset of the trial to the jury's understanding of its sentencing role, that ambiguity could only have been enhanced by the instructions and closing arguments that occurred just prior to the commencement of the jury's sentencing deliberations.

**8.** We express no opinion on the constitutionality of instructions or comments which accurately state the law applicable to sentencing and post-sentencing procedures but nonetheless may tend to diminish the jury's sense of sentencing responsibility. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (O'Connor, J., concurring); *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (upholding statutory requirement that capital sentencing juries be informed that governor could commute a sentence of life imprisonment without possibility of parole to a sentence that included the possibility of parole); *State v. Driscoll,* 711 S.W.2d 512 (Mo.) (permissible for prosecutor to state that trial judge has final decision in capital case because such statement is accurate where statute allows trial judge to reduce punishment), *cert. denied,* — U.S. —, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986).

sal of the sentence to death entered by the trial court.

## VI. CONCLUSION

In view of the necessity of reversing the sentence to death, we should not and do not reach the defendant's arguments that certain portions of section 16–11–103 violate constitutional standards. The judgment of conviction is affirmed, the judgment of sentence to death is reversed and the case is remanded to the trial court with directions to enter the alternatively authorized sentence of life imprisonment.

ERICKSON, J., specially concurs.

ROVIRA and VOLLACK, JJ., concur in part and dissent in part.

ERICKSON, Justice, specially concurring:

I concur with the opinion written by Justice Kirshbaum, but specially concur because of the two separate dissents which address the constitutionality of the death penalty. The record of the guilt phase contains numerous errors, none of which individually or collectively constitute reversible error. The death penalty phase of the case, however, does require reversal because of errors committed during that phase of the trial. Accordingly, under the facts of this case, I cannot uphold the sentence of death.

In my view, *People v. Durre*, 690 P.2d 165 (Colo.1984), requires reversal of the death penalty. I agree with the *Durre* analysis set forth in the majority opinion, but write separately to express my view that section 16–11–103, 8A C.R.S. (1986), does not suffer from the same infirmities that caused us to declare the predecessor death penalty statute to be unconstitutional in *People v. District Court*, 196 Colo. 401, 586 P.2d 31 (1978). In *People v. District Court*, we pointed out the infirmities in the death penalty statute, which the General Assembly corrected by enacting section 16–11–103. I agree with Justice Vollack's

analysis of the present statute and his conclusion that the statute is constitutional. I cannot, however, join Justice Vollack's dissent because of our decision in *Durre*.

ROVIRA, Justice, concurring in part and dissenting in part:

I concur in the judgment of the court affirming the verdict of guilty and ·join Justice Vollack's dissent as to the penalty phase. Because I would uphold the jury's verdict of death, I write separately on the question of whether Colorado's death penalty statute is constitutional in order to more specifically address the constitutional arguments made by the defendant.

### I.

The defendant contends that the death penalty statute violates due process and constitutes cruel and unusual punishment. Colo. Const. art. II, §§ 20, 25. He further contends that section 16–11–103(5), 8 C.R.S. (1978), is impermissibly vague and ambiguous and thus fails to meet the minimal requirements of certainty and clarity mandated by due process of law. He also argues that section 16–11–103(4), 8 C.R.S. (1979 Supp.), violates due process of law because it does not require the prosecution to disprove mitigating circumstances beyond a reasonable doubt.

### A.

The modern era of death penalty legislation and adjudication began in 1972 when the United States Supreme Court, in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), held that the Georgia death penalty statute violated the eighth and fourteenth amendments to the United States Constitution. The five Justices supporting this conclusion each wrote a separate opinion explaining his views. A reading of these opinions indicated the death penalty was not unconstitutional *per se*, but, rather, the manner in which the death sentence was being imposed was impermissible.

As a result of *Furman,* the legislatures of thirty-five states, including Colorado, and the Congress of the United States enacted or reenacted legislation which permitted the death penalty to be imposed. *See Gregg v. Georgia,* 428 U.S. 153, 179 nn. 23–24, 96 S.Ct. 2909, 2928 nn. 23–24, 49 L.Ed.2d 859 (1976). The Colorado legislature adopted a statute, subsequently approved by a vote of the people, which required the fact finder to consider aggravating and mitigating factors as a basis for arriving at a decision as to what penalty should be imposed in a first-degree murder case. Ch. 52, sec. 4, § 16–11–103, 1974 Colo.Sess.Laws 251, 252.[1]

In 1976, the Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed. 2d 928 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976); and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), considered the constitutionality of the death penalty procedure in those five states. In *Gregg,* which was the lead case, the Court was again divided, but it was on the approach authored collectively by Justices Stewart, Powell, and Stevens that the result in each case turned.[2]

From this collective opinion, it is evident that: the sentence of death for the crime of murder is not a *per se* violation of the eighth and fourteenth amendments to the Constitution; an assessment of contemporary values concerning the death penalty is relevant to the application of the eighth amendment; and a penalty must accord with the dignity of man which is a basic concept underlying the eighth amendment.

The Justices also stated that the requirements of the eighth amendment must be applied with an awareness of the limited role to be played by the courts, and,

> [T]herefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity.... And a heavy burden rests on those who would attack the judgment of the representatives of the people.... "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people."

*Gregg* at 175, 96 S.Ct. at 2926.

The plurality opinion concluded that the death penalty is not a form of punishment that may never be imposed, but to the contrary took the position that such a penalty was permissible if the statute set standards to guide and control the exercise of discretion by the sentencing authority. Further, a procedure should be adopted by which the fact finder could consider the circumstances of the crime and the character and situation of the defendant.

Subsequent to the adoption of the Colorado statute, the Court decided *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which mandated that the eighth and fourteenth amendments of the United States Constitution require that the fact finder must: "not be precluded

**1.** Senate Bill 46 required that it was to be submitted to a vote of the qualified electors at the November 1974 general election for their approval or rejection. The proposition was to be couched in the following language: "Shall the death penalty be imposed upon persons convicted of class I felonies where certain mitigating circumstances are not present and certain aggravating circumstances are present?" The vote was 451,403 to 286,805 in favor of adoption. Ch. 52, sec. 6, 1974 Colo.Sess.Laws 251, 254.

In 1966, a similar referendum was held. On the proposition, "Shall capital punishment be abolished?" the vote was 380,709 against and 193,245 in favor. Accordingly, capital punishment was not abolished. Ch. 132, secs. 1 & 3, 1965 Colo.Sess.Laws 507, 508.

**2.** In *Gregg* and the associated cases, the Court upheld the discretionary death penalty statutes of Georgia, Florida, and Texas and struck down the mandatory laws of North Carolina and Louisiana. I believe it correct to assume that the plurality opinion signed by Justices Stewart, Powell, and Stevens represents the majority view of the Court since four other members of the Court would have upheld even the mandatory statutes.

from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett* at 604, 98 S.Ct. at 2964 (emphasis in original) (footnotes omitted).

In *People v. District Court,* 196 Colo. 401, 586 P.2d 31 (1978), we found that the 1974 statute, section 16–11–103, 8 C.R.S. (1976 Supp.), "violates the constitutional commandment now set forth in the *Lockett* case because it does not allow the sentencing entity—in these cases, the jury—to hear all the relevant facts relating to the character and record of the individual offender or the circumstances of the particular case." 196 Colo. at 405, 586 P.2d at 34.[3]

The legislature again lent its efforts to enact a death penalty statute that would withstand constitutional scrutiny. In 1979, the statute was amended to add section 16–11–103(5.1), which authorized the fact finder to consider, in addition to certain statutory mitigating factors, "any other factors bearing on the question of mitigation." Ch. 158, sec. 1, § 16–11–103, 1979 Colo.Sess.Laws 673, 674.

The Colorado death penalty statute under which the defendant was sentenced, section 16–11–103, 8 C.R.S. (1978 & 1979 Supp.), was, except for the addition of sub-

section 5.1, substantially the same statute which the citizens of this state approved in 1974.

### B.

Despite this strong evidence of the will of the citizens of this state to have a death penalty statute, the defendant argues that the death penalty is offensive to Colorado's contemporary standards of decency and therefore constitutes cruel and unusual punishment under art. II, § 20, of the Colorado Constitution, which provides that, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." [4]

The "standards of decency" argument is based on the premise that standards of decency have evolved to the point where the state should not engage in the act of killing a human being regardless of the crime committed. The proponents of this thesis argue that capital punishment is so dehumanizing on the society which imposes the death penalty and the person upon whom it is inflicted that it is no longer a viable alternative in a civilized society.[5]

The defendant urges us to follow the lead of the California Supreme Court in *People v. Anderson,* 6 Cal.3d 628, 493 P.2d 880, 100 Cal.Rptr. 152 (1972), and the Massachusetts Supreme Judicial Court in *Dis-*

---

**3.** In *People v. District Court,* we expressed no opinion about the limits of punishment imposed by art. II, § 20, of the Colorado Constitution.

**4.** The history of the prohibition of "cruel and unusual" punishment as it relates to the eighth amendment was extensively reviewed in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and again in *Gregg v. Georgia,* 428 U.S. at 169, 96 S.Ct. at 2923. The Colorado constitutional prohibition against "cruel and unusual" punishments was adopted in 1876 at a time when capital punishment was common in most states. Even as a territory, Colorado had a death penalty. *General Laws Ch. XXII Criminal Code p. 198, sec. 20 (1868).* The first legislature enacted legislation providing death as the penalty for specified crimes. *General Laws XXIV,* Div. IV, sec. 615 Criminal Code (1877).

Early decisions of this court upheld the imposition of the death penalty. *See Smith v. People,*

1 Colo. 121 (1869) (affirming conviction for murder; sentence of death mandatory); *cf. Hill v. People,* 1 Colo. 436 (1872) (reversing death penalty due to shifting to defendant burden to show lack of intent). In short, the imposition of the death penalty has a long history of acceptance in Colorado.

**5.** The "standard of decency" argument was one of the primary arguments relied on by the defendants in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). It was rejected by a majority of the Court. Renewed in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), it was again rejected with the observation by Justices Stewart, Powell, and Stevens that, "it is now evident that a large proportion of American society continues to regard it [capital punishment] as an appropriate and necessary criminal sanction." *Gregg* at 179, 96 S.Ct. at 2928.

*trict Attorney for Suffolk District v. Watson,* 381 Mass. 648, 411 N.E.2d 1274 (1980). In those cases, the respective courts adopted the "standard of decency" argument and held the death penalty statute unconstitutional under their respective state constitutions.

Whatever the strength and weakness of these decisions, later events clearly established that they did not represent the views of the people of those states.

*Anderson* was decided in February 1972. In November 1972, the people of California responded by adopting, through initiative, a constitutional amendment which provided that the death penalty shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishment under the California Constitution. Cal. Const. art. I, § 7, adopted Nov. 7, 1972. Within two years of the *Watson* decision, the citizens of Massachusetts approved a constitutional amendment effectively overruling *Watson;* the legislature reenacted the death penalty six weeks later. *See Commonwealth v. Colon-Cruz,* 393 Mass. 150, 470 N.E.2d 116, 117–18 (1984).

The citizens of Colorado, directly and through their elected representatives, have repeatedly declared their support of the death penalty. They have expressed the values of the community. Since contemporary community values are the test, their view must be accepted as the standard by which to measure a claim that the death penalty is offensive to contemporary standards of decency in Colorado.

Despite the continuing debate in all segments of society over the morality and desirability of capital punishment, it is now patently clear that a substantial majority of our society regards it as an appropriate sanction. *See Spaziano v. Florida,* 468 U.S. 447 at 463–64 n. 9, 104 S.Ct. 3154 at 3164 n. 9, 82 L.Ed.2d 340 (1984) (in 1984, 37 states had a capital sentencing statute).

The defendant offers no basis to reject the expressed will of the people and the legislature other than to suggest that the steady decrease in the number of executions in Colorado[6] "persuasively demonstrates that capital punishment is unacceptable today." In effect, the defendant suggests that because the state has not executed anyone in the past twenty-one years, the citizens of this state in reality do not want a death penalty statute regardless of how they or their elected representatives vote.

From 1967 to 1972, when *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), was decided, a *de facto* moratorium had existed while cases challenging the procedures for implementing the death penalty were being reexamined by the United States Supreme Court. In Colorado, the legislative effort to adopt a constitutional death penalty statute was rejected by this court in *People v. District Court,* 196 Colo. 401, 586 P.2d 31 (1978), because the statute did not allow the sentencing entity to hear all the relevant facts relating to the character and record of the offender or the circumstances of the case contrary to *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). At the legislative session immediately following our decision, the legislature amended the death penalty statute in an effort to remedy the defects we had pointed out in *District Court;* ch. 158, sec. 1, § 16–11–103, 1979 Colo.Sess.Laws 673–75.[7]

These repeated reenactments of the death penalty statute indicate that it is not the legislature's desire for a death penalty statute which has been lacking in recent years, but, rather, it is their ability to draft one that complies with constitutional standards which has been deficient. In addition, as the New Jersey Supreme Court said in response to this same argument,

---

**6.** The defendant points out that executions in Colorado have decreased from seven in 1930 (25 between 1930–1939) to one in 1967, and none since.

**7.** In 1984 and 1985, the legislature amended the death penalty statute. Ch. 120, secs. 1–8, 1984 Colo.Sess.Laws 491–96; ch. 145, sec. 8, 1985 Colo.Sess.Laws 647, 653–54. *See also* footnote 1 and accompanying text.

"the lack of executions may have had more to do with judicial standards than with community standards." *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 212 (1987). I believe that it is correct to say today, as this court said seventy-eight years ago, "If capital punishment is to be abolished, the remedy lies with the legislative branch of the state government." *Demato v. People,* 49 Colo. 147, 150, 111 P. 703, 704 (1910). Accordingly, I am of the opinion that Colorado's death penalty statute does not violate our state constitutional prohibition against cruel and unusual punishment.

### C.

The defendant contends that even if the death penalty furthered some valid purposes it serves no legitimate purpose more effectively than imprisonment. In support of this argument, he notes that the legislature has articulated four purposes of its sentencing provisions: to punish by assuring the imposition of a sentence relative to the seriousness of the offense; fair and consistent treatment by eliminating unjustified disparity in sentences; deterrence; and rehabilitation. § 18–1–102.5, 8B C.R.S. (1986).

He claims that of these four purposes two are actually frustrated by the death penalty. Execution presents an ultimate obstacle to the rehabilitation that could otherwise be effected, and the death penalty magnifies disparities through its arbitrary and selective imposition.

I agree that the purpose of rehabilitation is frustrated by the death penalty. However, rehabilitation is only one of four stated purposes—punishment and deterrence are also to be weighed in the balance. *People v. Watkins,* 200 Colo. 163, 613 P.2d 633 (1980). The defendant's arbitrary imposition argument is grounded on his claim that the selection of those persons who suffer the death penalty remains arbitrary despite the legislature's attempts to limit the jury's discretion. In support of his argument, he steps outside of the record to inform us that his brother James, who he claims actually killed Regina Drake, was convicted in a separate trial of accessory to murder in the first degree and received an eight-year sentence.[8]

The defendant's argument has been previously rejected for sound reasons, and I reject it here. There can be little doubt that there is no requirement that all persons involved in the same crime receive the same penalty. *People v. Brubaker,* 189 Colo. 219, 539 P.2d 1277 (1975) (no requirement that coconspirators receive same sentence); *Antone v. Strickland,* 706 F.2d 1534 (11th Cir.), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 511, 78 L.Ed.2d 699 (1983), *cert. denied and stay of execution denied, sub nom. Antone v. Dugger,* 465 U.S. 200, 104 S.Ct. 962, 79 L.Ed.2d 147 (1984); *see Ross v. Kemp,* 756 F.2d 1483 (11th Cir. 1975).

The substance of defendant's argument is that since prosecutors have discretion to initiate death penalty cases their unbridled exercise of that discretion is violative of his constitutional rights to due process of law. Colo. Const. art. II, § 25.

---

**8.** In *People v. District Court,* 711 P.2d 666 (1985), the People sought relief in the nature of mandamus in connection with the respondent court's refusal to impose a life sentence on James Drake. There, James Drake had been charged with the first-degree murder of Regina Drake and habitual criminality. James Drake testified that Richard Drake killed the victim and he had only assisted Richard in hiding some bloody items and making a phone call to establish an alibi for Richard. James Drake requested an instruction on the lesser non-included offense of accessory to murder in the first degree. The jury returned a not guilty verdict to the charge of murder and a guilty verdict to accessory to murder. The jury also returned a verdict finding James Drake had previously been convicted of three felonies.

The trial court, believing that it could not impose a life sentence on James Drake because he had not been found guilty of the crime charged in the information, sentenced James Drake to seven years and eight months plus one year of parole. We reversed, holding that when a verdict of guilty to a lesser non-included felony is followed by a verdict that the defendant has been convicted previously of three felonies, section 16–13–101(2), 8 C.R.S. (1985 Supp.), mandates the imposition of a sentence to life imprisonment.

In *Gregg,* this argument was considered and rejected. The plurality opinion observed that:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

*Gregg* at 199, 96 S.Ct. at 2937. *See also Gregg* at 199–200 n. 50, 96 S.Ct. at 2937–38.

A concurring opinion also addressed the issue of prosecutorial discretion as follows:

> Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty

> through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt.

*Gregg,* 428 U.S. at 225, 96 S.Ct. at 2949 (White, J., concurring).

I also reject the defendant's argument for another reason. Section 16–11–103(7)(b), 8 C.R.S. (1979 Supp.), requires that a sentence of death shall not be imposed if "the supreme court determines that the sentence was imposed under the influence of passion or prejudice or any other arbitrary factor...."

Based on the record here, I do not believe that the decision of the prosecutor to seek the death penalty against the defendant alone reflects an arbitrary act. Such a decision is one which is invested in the district attorney, and absent evidence of an irrational or discriminatory application of that discretion, the defendant's argument has no validity. *People v. Hernandez,* 686 P.2d 1325 (Colo.1984); *People v. Lewis,* 680 P.2d 226 (Colo.1984); *Sandoval v. Farish,* 675 P.2d 300 (Colo.1984).

### D.

The defendant contends that the death penalty is unconstitutionally cruel and unusual punishment and violates due process because the state has failed to show that it is the least drastic means available to fulfill any compelling state interest. His argument is grounded on the premise that there is no evidence that the death penalty "enjoys a superior deterrent effect" and the public can be protected by means other than execution.

The deterrent effect of the death penalty has been hotly debated, and statistical attempts to evaluate the worth of the death

penalty as a deterrent have been inconclusive. *Gregg*, 428 U.S. at 184–85, 96 S.Ct. at 2930. In resolving the issue raised by the defendant, I am guided by the basic principle that it is the legislature which has the responsibility to define crimes and establish the appropriate punishments. Only if constitutional bounds are overreached should we exercise our power to find unconstitutional such punishments. *Id.* at 174–75, 96 S.Ct. at 2926.

The legislative determination that the death penalty is warranted under certain circumstances is entitled to the presumption that its acts are constitutional and a heavy burden rests on those who would attack its judgment. *Gregg* at 175, 96 S.Ct. at 2926. *See also People v. Jackson*, 28 Cal.3d 86, 618 P.2d 149, 168 Cal.Rptr. 603 (1980) (death penalty laws are presumed constitutional); *In re Anderson*, 69 Cal.2d 613, 447 P.2d 117, 73 Cal.Rptr. 21 (1968).

Here, the legislature has concluded that the death penalty is within the purposes which have been established for sentencing under the Colorado Criminal Code. § 18–1–102.5, 8 C.R.S. (1979 Supp.). Among these purposes are retribution (punishment) and deterrence.

Retribution constitutes a valid penological objective for the death penalty. It is not a forbidden objective nor one inconsistent with our respect for the dignity of men. *Gregg*, 428 U.S. at 183, 96 S.Ct. at 2930. Deterrence is also a permissible purpose and whether the death penalty deters murder is a question most appropriately weighed and considered by the legislature. I believe that the legislature could find that it does just as it could find that it does not. Since the legislature is best equipped to evaluate "the moral consensus concerning the death penalty and its social utility as a sanction," *Gregg*, 428 U.S. at 187, 96 S.Ct. at 2931, I conclude that the Colorado death penalty statute does not violate the defendant's due process rights nor is cruel and unusual punishment under the United States or Colorado Constitutions.

### E.

The defendant contends that four of the five mitigating factors set forth in section 16–11–103(5), 8 C.R.S. (1979 Supp.), are couched in language which is "impermissibly vague, unclear and ambiguous and fail to meet the minimal requirements of certainty and clarity of due process of law...."

The challenged portion of the statute reads:

(5) The court shall not impose the sentence of death on the defendant if the sentencing hearing results in a verdict or finding that at the time of the offense:

. . . .

(b) His capacity to appreciate wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution; or

(c) He was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution; or

(d) He was a principal in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution; or

(e) He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person.

The critical focus in a vagueness challenge is whether the law "either forbids or requires the doing of an act in terms so vague that men of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Due process does not require "mathematical exactitude in legislative draftsmanship." *E.g., People ex rel. City of Arvada v. Nissen*, 650 P.2d 547, 550 (Colo.1982).

We also observed in *People v. Schoondermark*, 699 P.2d 411, 415 (Colo.1985), that the "Due Process Clauses also seek to limit arbitrary and discriminatory enforce-

ment of laws by requiring sufficiently clear and defined standards which are capable of fair application by police, prosecutors, judges, and juries." *See also Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The defendant contends that the quoted provisions of the statute do not meet these standards because they fail to give him and the jury adequate notice of the type of conduct that will subject him to, or exclude him from, the death penalty. He also complains that the description of conduct which constitutes mitigating circumstances becomes even more ambiguous when qualified by the requirement that such conduct does not need to constitute a defense to prosecution. I disagree.

The type of conduct referred to in subsections 5(b) through (e), capacity to appreciate wrongfulness of conduct, duress, minor participation and creating a grave risk of death, are set out in words that are common and easily understood by persons familiar with the English language. The words can be understood in light of the duty of the fact finder to consider whether the defendant's conduct comes within their meaning.

The term "as to constitute a defense to prosecution" is also sufficiently clear and understandable. This statutory language, enacted for the benefit of a person who is potentially subject to the death penalty, makes it possible for the fact finder to find that a defense rejected on the merits at the guilt phase of the trial may nevertheless warrant sentencing leniency.

In *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the petitioner argued that the statutory mitigating factors in the Florida death statute were vague because whether a defendant acted "under the influence of extreme mental or emotional disturbance," whether defendant's capacity "to conform his conduct to the requirements of law was substantially impaired," or whether a defendant's participation as an accomplice was "relatively minor" are questions beyond the capacity of a judge or jury to determine.

In response to this argument, the Court said:

> While these questions and decisions may be hard, they require no more line drawing than is commonly required of a fact finder in a law suit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned mitigating circumstances.

*Proffitt* at 257–58, 96 S.Ct. at 2969.

### F.

The defendant's final argument concerning the constitutionality of the death penalty statute is that the failure to require the prosecution to disprove the existence of the mitigating and additional mitigating factors set forth in section 16–11–103(5) and (5.1), 8 C.R.S. (1978 & 1979 Supp.), beyond a reasonable doubt violates due process of law.

Section 16–11–103(3), 8 C.R.S. (1979 Supp.), requires that the prosecution prove the existence of aggravating circumstances beyond a reasonable doubt. However, the statute is silent as to what the burden of proof is, and who bears it, in establishing whether or not mitigating factors exist.[9]

In considering whether the due process clause of the United States Constitution requires the prosecution to disprove the existence of statutory mitigating factors, the United States Supreme Court has stated that "the Constitution does not require a State to adopt specific standards for instructing the jury in consideration of aggravating and mitigating circumstances...." *Zant v. Stephens,* 462 U.S. 862,

---

**9.** This silence was expressly noted by this court in *People v. Durre,* 690 P.2d 165, 168 n. 8 (Colo. 1984). Later in 1984, the legislature amended section 16–11–103(1)(d), 8A C.R.S. (1986), to provide that "there shall be no burden of proof as to proving or disproving of mitigating factors." Ch. 120, sec. 1, § 16–11–103, 1984 Colo.Sess.Laws 491, 492.

890, 103 S.Ct. 2733, 2750, 27 L.Ed.2d 235 (1983); *see also Patterson v. New York,* 432 U.S. 197, 207–209, 97 S.Ct. 2319, 2325–26, 53 L.Ed.2d 281 (1977) (state statute requiring the defendant to prove by a preponderance of the evidence the affirmative defense of extreme emotional disturbance upheld against a federal due process challenge; "it would not necessarily follow that a State must prove beyond a reasonable doubt every fact, the existence or nonexistence of which it is willing to recognize as an exculpatory or mitigating circumstance affecting the degree of culpability or the severity of punishment.... If the State nevertheless chooses to recognize a factor that mitigates the degree of criminality or punishment, we think the State may assure itself that the fact has been established with reasonable certainty. To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue, if in its judgment, this would be too cumbersome, too expensive, and too inaccurate.").

State and lower federal courts which have examined the issue have reached the same result.[10] Though the rationales for these holdings are not always identical, two major themes emerge. The first, and most important, is the differing purposes of the guilt phase and penalty phase of a trial. At the guilt phase, the purpose is to determine whether the defendant is guilty of committing the crime charged. It is elementary that the state must prove all elements of the offense charged beyond a reasonable doubt.

At the penalty phase, however, the issue is whether the death sentence is appropriate. In *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Court stated:

> More to the point, however, is the fundamental difference between the nature of the guilt/innocence determination at

---

**10.** *Gray v. Lucas,* 677 F.2d 1086 (5th Cir.1982) (scheme requiring jurors to find the existence of aggravating circumstances beyond a reasonable doubt, and then weigh those factors against mitigating factors, upheld as facially valid), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983); *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978) (when the issue of guilt has been settled, to require the prosecution to negate mitigating circumstances would place an impermissible burden on the state), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979); *Hulsey v. State,* 261 Ark. 449, 549 S.W.2d 73 (1977) (the absence of mitigating circumstances is not an element to be proved beyond a reasonable doubt), *cert. denied,* 439 U.S. 882, 99 S.Ct. 220, 58 L.Ed.2d 194 (1978); *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981) (at penalty phase, inquiry is into all relevant facts and circumstances weighing upon the propriety of capital punishment, not into elements of the offense); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830, 849 (1980) (due process principles "do not require the prosecution to either prove beyond a reasonable doubt the absence of mitigating circumstances, or to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances."), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *State v. Bass,* 189 N.J.Super. 445, 458, 460 A.2d 214, 221 (1983) ("there is no constitutional requirement for the State to prove the insufficiency of such mitigating factors beyond a reasonable doubt."); *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510 (1979)

(due process does not require the prosecution to disprove beyond a reasonable doubt the existence of factors which mitigate the degree of punishment), *cert. denied,* 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed.2d 1137 (1980); *State v. Downs,* 51 Ohio St.2d 47, 59, 364 N.E.2d 1140, 1148 (1977) (finding no authority "to support the proposition that the lack of mitigating factors is an additional, constitutionally mandated element of a capital offense") (vacated on other grounds in light of *Lockett v. State* at 438 U.S. 909, 98 S.Ct. 3133, 57 L.Ed.2d 1153 (1978)); *Parks v. State,* 651 P.2d 686 (Okla.Crim.App. 1982) (prosecution's only burden is to prove beyond a reasonable doubt the elements of the crime and any aggravating circumstances), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983); *Commw. v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982) (proving the elements of the crime and any aggravating circumstances is all that is constitutionally required of the prosecution), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *State v. Pierre,* 572 P.2d 1338 (Utah 1977) (prosecution is not required to disprove mitigating circumstances; burden would be impossible to sustain in many instances), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

The defendant has cited no case, and my research has discovered none, in which it was held that due process required that the prosecution disprove mitigating factors beyond a reasonable doubt.

issue in *Beck* [*v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)] and the nature of the life/death choice at the penalty phase. As noted above, the Court in *Beck* identified the chief vice of Alabama's failure to provide a lesser included offense option as deflecting the jury's attention from 'the *central issue* of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime.' In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar 'central issue' from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.

*Ramos* at 1007–08, 103 S.Ct. at 3457 (emphasis added) (citation and footnote omitted).

Simply put, once a defendant has been found guilty of a capital crime and aggravating circumstances have been proven beyond a reasonable doubt, the state has made its case for death. Requiring that the defendant then show mitigating circumstances exist does not violate due process.[11]

The second rationale that can be gleaned from the numerous cases cited in footnote 10 is that the burden on the state of proving beyond a reasonable doubt that no mitigating circumstances exist is virtually impossible to meet. Aside from the difficulty of proving the absence of a condition in general, *see People v. Y.D.M.*, 197 Colo. 403, 593 P.2d 1356 (1979) (permissible to place burden on defendant to show excuse when investigation by the People might

unearth no evidence), the factors that serve as mitigators tend to be facts within the defendant's scope of knowledge. *State v. Smith*, 125 Ariz. 412, 610 P.2d 46 (1980); *State v. Pierre*, 572 P.2d 1338 (Utah 1977), *cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); *cf. People v. Y.D.M.*, 197 Colo. at 409, 593 P.2d at 1360 ("it is not manifestly unfair to place on the child the burden to show her absences from school were excused, for the facts which prove or disprove a claimed excuse are uniquely within the knowledge of the child....").

The factors which allow for mitigation under section 16–11–103(5.1) include, *inter alia*, the influence of drugs or alcohol, the good faith—although mistaken—belief by the defendant that his actions were morally justified, and that the defendant is not a continuing threat to society. It would be impossible as a practical matter, for example, for the state to disprove beyond a reasonable doubt that the defendant did not have a good faith belief that his actions were morally justified.

Further, section 16–11–103(5.1)(h) provides that the defendant can submit any evidence which may bear on the question of mitigation. This broad "catchall" category allows the defendant to present a wide variety of evidence, much of it totally beyond the possibility of rebuttal, much less disproof beyond a reasonable doubt.

For example, the defendant called several witnesses to testify on his behalf at the penalty phase of the trial. One witness testified that he believed the defendant was a born-again Christian and did not represent a continuing threat to society; another testified that the defendant was his friend and still had something useful to contribute to society; another testified that she was of the opinion the defendant had come to realize that God exists; a fourth was of the opinion that the defendant loves people and Christ and there is still something positive

---

**11.** The defendant relies on *People v. Chavez*, 621 P.2d 1362 (Colo.1981), to support his argument. However, *Chavez* dealt with the issues of the right to remain silent and the right to be con-

victed by proof beyond a reasonable doubt. Here, the defendant's guilt was already established, and only sentencing remained. *Chavez* is therefore inapposite.

that he could do with his life; and finally, the pastor of the Adventist church was of the opinion that the defendant seemed sincere and wanted to make something of his spiritual life.

All these witnesses gave testimony to support mitigation—and none of it is susceptible to being refuted. Their testimony reflects, in varying degrees, ethical, moral, and religious principles which are at the very core of their lives. Those principles are not subject to being disproved in a court of law.

Accordingly, I am of the opinion that the defendant's due process rights to being convicted only by proof beyond a reasonable doubt are not affected by the legislature's decision not to require the People to disprove mitigating factors at the sentencing stage.

Because I am convinced that the conviction and death sentence of the defendant does not violate the United States Constitution or the Constitution of the State of Colorado, I would affirm both the judgment of conviction and the sentence.

VOLLACK, Justice, concurring in part and dissenting in part:

I concur in the majority's affirmance of the guilt phase of these proceedings. However, I dissent to Part V because I do not agree with the majority's reversal of the penalty phase. After review of the voir dire, closing arguments, jury instructions, and the jury's verdict, I disagree with the majority's conclusion that the jury did not understand its responsibility. In affirming the penalty phase, I would uphold the constitutionality of Colorado's death penalty statute, as well as the constitutionality of its application to this defendant.

## I.

### THE PENALTY PHASE

Review of relevant portions of the record includes analysis of the ante-voir dire instruction and the judge's voir dire statements, remarks made by the prosecutor in closing argument, and the jury instructions.

In *People v. Durre*, 690 P.2d 165 (Colo. 1984), this court reversed the penalty phase in a capital case because of the jury's demonstrated misunderstanding of its responsibility, and of the effect of its penalty phase votes. In the penalty phase in *Durre*, the jury returned the verdict forms with a note attached. This note explained to the judge that the jury had reached a vote of seven to five in favor of the death penalty. Based on those facts, we held that "[t]he jury note, when viewed in the context of the instructional deficiency present here, manifests a significant degree of uncertainty on whether all twelve jurors actually concurred." *Id.* at 174.

In the case before us, the issue is whether the jurors were misled into believing that their votes would not determine whether the death sentence was appropriate punishment for this defendant. Unlike *Durre*, in this case there is no manifestation of "a significant degree of uncertainty." No facts are presented by either side, or reflected in the record, to suggest the uncertainty that was demonstrated in *Durre*. Lacking a basis in the record, I disagree with the majority's conclusion that the jury did not understand what it was doing when it voted that three aggravating factors and no mitigating factors had been established. It is the "fact-finding jury, and not the court, that decides whether there are additional mitigating circumstances sufficient to justify a sentence of life imprisonment rather than death." *Id.* at 172 (footnote omitted). In carrying out this role, the jury's task is to " 'express the conscience of the community on the ultimate question of life or death.' " *Id.* (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968)). Because I believe the majority is impermissibly substituting its interpretation of the facts for the conclusion reached by the jury as the factfinder and sentencer, I dissent from the majority's holding as to the penalty phase.

## A.
### Voir Dire and the Ante–Voir Dire Instruction

Before voir dire can begin in a death penalty case, the judge must give the jury panel a specific instruction regarding the death penalty. At the time of the *Drake* trial, this ante-voir dire instruction was controlled by our holding in *People v. District Court*, 190 Colo. 342, 546 P.2d 1268 (1976) (hereinafter *District Court I*). In *District Court I*, we described the purpose of the ante-voir dire instruction and provided the following recommended form for such an instruction:

In the event that the defendant is found guilty as charged in [description of charge in information or indictment], there will follow a second hearing before the same jury. Evidence may be introduced at this hearing. At the conclusion of the hearing *certain questions will be submitted to the jury* to take to the jury room for deliberation and response. After these questions have been answered and, *depending upon the answers* as prescribed by law, *the judge will sentence the defendant either to life imprisonment or death.*

The sentence of the judge will be dependent upon the answers of the jury and, while the jury may not be fully advised as to the effect of any particular answer or group of answers, the People and the defendant have the right to examine you as prospective jurors within appropriate limits as to your views on capital punishment.

*District Court I*, 190 Colo. 342, 346, 546 P.2d 1268, 1271 (1976) (emphasis added).

The *Drake* jury panel received the following ante-voir dire instruction:

In this case, the People are asking for the imposition of the death penalty. This is a capital case. In the event that the defendant is found guilty as charged in the Information, there will follow a second hearing before the same jury. Evidence may be introduced at this hearing

and at the conclusion of the hearing, *certain questions will be submitted to the jury* to take to the jury room for deliberation and response. After these questions have been answered and *depending upon the answers as prescribed by law, the Judge will sentence the defendant either to life imprisonment or to death.*

(Emphasis added.) Comparing the language of the *Drake* instruction to the instruction in *District Court I*, I believe that this jury was adequately advised prior to voir dire. Although the *Drake* instruction is not identical to the *District Court I* instruction, it provided the necessary explanation of the role of the jury in the sentencing phase. The instruction served to "enable counsel to determine whether any prospective jurors" had beliefs which would cause them to prevent the defendant from obtaining a fair trial. *District Court I*, 190 Colo. at 346, 546 P.2d at 1271. The language of the instruction was substantially similar to the recommended instruction, and served the express purpose of such an instruction. There is no significant concept or statement rendering the *Drake* instruction inadequate. The potential jurors were properly advised of the nature of the case when voir dire began, and the voir dire instruction was not erroneous.

The other procedure affecting the jury's understanding of its role was the questioning of individual jurors during voir dire, and statements made to the jurors by the judge about the jurors' roles. Two representative statements to the individual jurors are as follows: "[B]ased upon your answers to those questions, the court will either impose the death penalty or prison", and "based upon your answers to [certain questions], the court will impose the death penalty or life imprisonment as the answers dictate." These voir dire statements served to again educate the jury about its role. The potential jurors had the benefit of hearing this type of explanation repeated to each individual juror. There is no evidence in the record supporting the conclusion that any juror was misled or confused.

"[T]he 'obvious thing' for the jury to have done *if unanimity existed* on the verdicts would have been to return the verdict forms appropriately signed with nothing more." *Durre,* 690 P.2d at 174–75 (quoting *People v. Yeager,* 170 Colo. 405, 409, 462 P.2d 487, 489 (1969)) (emphasis added). The jury here did "the obvious thing" by returning signed verdict forms, with nothing more. *Id.* In the absence of any manifestation of confusion, it is not our role to read into the record confusion or uncertainty on the part of the jury.

### B.

### Closing Arguments

The defendant contends that the prosecutor's use of the phrase "shared responsibility" in closing argument so misled the jury as to invalidate the penalty phase. I disagree.

The majority reverses the jury's unanimous verdict based on the law in *People v. Durre,* 690 P.2d 165 (Colo.1984), majority op. at 1254–1258, and *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed. 2d 231 (1985), majority op. at 1258–1260. In *Caldwell,* the United States Supreme Court vacated the defendant's death sentence because the prosecutor told the jury during closing argument that it could shift its responsibility to an appellate court. 472 U.S. at 330, 105 S.Ct. at 2640. The prosecutor's statement was: "[Y]our decision is not the final decision.... Your job is reviewable ... [T]he decision you render is automatically reviewable by the Supreme Court." *Id.* at 325–26, 105 S.Ct. at 2638. The Court held that these statements required vacation of the penalty phase because the prosecutor had impermissibly advised the jury that it could shift its sentencing responsibility elsewhere.

In so holding, the Court distinguished its earlier holding in *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). In *Ramos,* the trial court gave the so-called *Briggs* instruction, advising the

jury that a sentence of life imprisonment without parole could be commuted by the Governor of California to a sentence that could include the possibility of parole. 463 U.S. at 995, 103 S.Ct. at 3450. The petitioner in *Ramos* argued that this instruction violated the United States Constitution, but use of the *Briggs* instruction was upheld by the Court as "merely an accurate statement of a potential sentencing alternative." *Id.* at 1009, 103 S.Ct. at 3457. The Court distinguished *Ramos* from *Caldwell* by saying that the statement [in *Caldwell*] regarding appellate review was neither accurate nor relevant. *Caldwell,* 472 U.S. at 335, 105 S.Ct. at 2643. In *Caldwell,* it was held "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328–29, 105 S.Ct. at 2639. The majority deems it an "inescapable ... conclusion that doubt or speculation" exists in this case. Majority op. at 1257. I believe this conclusion is incorrect, viewing the record as a whole.

During closing arguments, the prosecutor in *Drake* stated: "[Y]ou will understand the responsibility that you have and I am not going to pound you over the head about the awesomeness of it...." He also said: "[T]his is a law that was passed here in our state and ... you are to make a factual determination based on the evidence here." The prosecutor used this "shared responsibility" language twice in reminding the jurors that their responsibility was to apply the law as written. In rebuttal, the prosecutor referred to the jury's "shared responsibility" by saying: "I would again like to remind you that what you have is a shared responsibility. This is the law in our state that was passed. You are not alone. This case would not be here but for the actions of the police and it would not be here but for the actions of the prosecution...."

The determination of whether improper remarks are made during closing argument

depends on "the nature of the comment and on whether the jury's attention has been directed to something which it is not entitled to consider." *People v. Constant*, 645 P.2d 843, 846, *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). The meaning and effect of particular remarks made in a prosecutor's closing argument must be evaluated in the context of the evidence, and the closing argument as a whole. *People v. Gutierrez*, 622 P.2d 547 (Colo.1981); *People v. Marin*, 686 P.2d 1351 (Colo.App.1983). In the specific context of capital sentencing, the United States Supreme Court has reversed a death penalty verdict on the grounds of substantial unreliability "when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court." *Caldwell*, 472 U.S. at 330, 105 S.Ct. at 2640.

Defense counsel did not object to the "shared responsibility" remarks made during closing argument, so plain error is the standard of review. The plain error standard is "whether an appellate court, after reviewing the entire record, can say with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987).

The language of these remarks served to remind the jurors of their duty to apply the law, as written by the Colorado legislature, to the facts presented at trial. I believe the prosecutor's "shared responsibility" statements were accurate and not misleading, when considered in their context.[1] Reminding the jury that the legislature was responsible for reenacting the death penalty statute was an accurate statement. Comparing *Caldwell* and *Ramos* to this case, I believe the remarks here are controlled by *Ramos* because the remarks were accurate and relevant in describing the jury's role. The prosecutor did not tell the jury that it could shift its responsibility elsewhere; he told the jury that it was to make a factual determination and to apply "a law that was passed here in our state." These statements did not direct the jury's attention "to something which it is not entitled to consider." *Constant*, 645 P.2d at 846. On that basis, I do not believe the statements made in closing argument justify reversal.

## C.
### Jury Instructions and The Jury Verdict Form

I dissent because I believe that the instructions and jury verdict form are adequate under *People v. Durre*, 690 P.2d 165 (Colo.1984).[2] The majority relies almost exclusively on the jury verdict form and instructions in concluding that the penalty phase cannot stand under *Durre*.

In *Durre*, the trial court failed to inform the jury during the penalty phase as to the effect of their votes on aggravating and mitigating factors. The jurors returned a note with their verdict forms, explaining to the judge that they had arrived at a vote of seven to five in favor of the death penalty. Based on this unmistakable showing of confusion, we held that "[t]he jury note, when viewed in the context of the instructional deficiency present here, *manifests a significant degree of uncertainty* on whether all twelve jurors actually con-

---

**1.** Even if the jurors were misled by the prosecutor's reference to a "shared responsibility," they could hardly have misunderstood their burden when the defense attorney argued to the jury that the evidence presented "does not make [the defendant] the type of person if you got so mad about what they have done that you would want *to kill them with the death penalty.*"

**2.** *Griffith v. Kentucky*, —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), requires that the law

in *Durre* be applied retroactively. In *Griffith*, the United States Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 716. Because this case is not yet final, the law in *Durre* must be applied retroactively to the defendant's trial.

curred in the finding." *Id.* at 174 (emphasis added). *Durre* requires that a jury be instructed "regarding the effect of their verdicts on the issue of punishment," and we set forth a recommended instruction for use in future cases:

> If your verdicts are that no mitigating and no additional mitigating circumstances exist, and further that one or more aggravating circumstances exist, then the court has no discretion whatever on the matter of penalty and must sentence the defendant to death; if, on the other hand, your verdicts are that one or more of the mitigating or additional mitigating circumstances exist, or that none of the aggravating circumstances exist, then the court has no discretion whatever on the issue of punishment and must sentence the defendant to life imprisonment.

*Id.* at 174 n. 15.

Our ruling in *Durre* post-dated the *Drake* trial, so the trial judge in *Drake* did not have the advantage of the recommended instruction when he advised the jury. The jury verdict form given in *Drake* utilized the statutory language and the pattern instructions. The form stated in part: "YOU MAY CONSIDER ANY FACTOR INCLUDING BUT NOT LIMITED TO THE FOLLOWING, IN DECIDING WHETHER A SENTENCE OF LIFE IMPRISONMENT RATHER THAN DEATH IS JUSTIFIED" and "We, the Jury, having considered all of the evidence, find one or more mitigating factors justifies the sentence of life imprisonment rather than death." The jurors were thus advised that their vote on mitigating factors would determine whether the defendant received a sentence of life imprisonment or death.

The jury was not instructed with the specific language later recommended in *Durre*. *Durre* requires that an instruction be given "in the following or similar terms," and that the instruction tell the jury "about the effect of their verdicts on the life and death decision that the jurors were being required to make." *Durre*, 690 P.2d at 174 n. 15. I believe the instruction given here meets this requirement, because it adequately advised the jury as to the "effect of their verdicts." *Id.* This protects the reliability of the verdict as discussed in *Durre*, especially in light of the language of the jury verdict form and the unequivocal nature of the jury's votes. The jury was adequately advised; to hold otherwise would be to elevate form over substance.

### D.

In summary, this case presents none of the factual circumstances which justified reversal of the death penalty in other cases. *Durre* involved a jury that unequivocally demonstrated its confusion when it returned a verdict form with a note attached indicating a seven to five vote. *Caldwell* involved repeated statements by the prosecutor that the jury need not consider its decision final because the sentence was subject to automatic appellate review. The facts like those in *Durre* and *Caldwell* demonstrate the type of confusion or misleading of a jury that requires reversal in a capital case.

"While technical perfection in the deliberative process is not demanded and is often an impossibility, the severity of the death sentence does mandate 'careful scrutiny in the review of any colorable claim of error.'" *Durre*, 690 P.2d at 173. The jurors' responses to the determinative questions on the jury verdict form reflected their application of the law to the facts before them. " '[O]ne of the most important functions any jury can perform in making ... a selection [between life imprisonment and death for a defendant convicted in a capital case] is to maintain a link between contemporary community values and the penal system.' " *Gregg*, 428 U.S. at 181, 96 S.Ct. at 2929 (citing *Witherspoon v. Illinois*, 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775 n. 15, 20 L.Ed.2d 776 (1968). Because I believe the record shows that the jury understood the import of its penalty phase votes, I disagree with the majority's reversal of the verdict. The jury did not

demonstrate any confusion before, during, or after the trial and penalty phase, and it was adequately advised under the existing law. Their conclusion is reflective of the jury's function in applying objective standards to arrive at a penalty reflective of "contemporary community values."

## II.

Because I would uphold the jury's verdict in the guilt phase, I necessarily address the constitutionality of Colorado's death penalty statute, section 16–11–103, 8A C.R.S. (1986).

Following the United States Supreme Court's 1972 decision in *Furman v. Georgia,* the legislatures of thirty-seven states have enacted or reenacted legislation providing for imposition of the death penalty when a defendant is convicted of first degree murder. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (death penalty statute is not per se unconstitutional, but may be applied in an unconstitutional manner); Rosen, *The "Especially Heinous" Aggravating Circumstances in Capital Cases—The Standardless Standard,* 64 N.C.L.Rev. 941 (1986) (hereinafter cited as Rosen).

In 1976, the Supreme Court reviewed the constitutionality of five of these post-*Furman* death penalty statutes. The lead case was *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), followed by *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed. 2d 929 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Mandatory sentencing schemes were struck down in *Roberts* and *Woodson* because the statutes' requirements that "the death penalty be imposed on all defendants convicted of a specified category of murder" was violative of the eighth amendment of the United States Constitution. Rosen at 947 (footnote omitted).

In contrast to mandatory sentencing, the death penalty statutes in Florida, Georgia, and Texas, like our Colorado statute, "allow the sentencer to impose the death penalty under standards provided by the legislature." *Id.* (footnote omitted). Addressing these statutes, which allow but do not require imposition of the death penalty, the Supreme Court (in plurality opinions) affirmed the state's right to impose the death penalty if the sentencer is "provided legislatively drafted standards to channel the sentencer's discretion to avoid the arbitrariness, capriciousness, and discrimination" fatal to the statute in *Furman v. Georgia.* Rosen at 948. Like the statutes in Florida and Georgia, Colorado's capital sentencing procedure is patterned in large part on the Model Penal Code. *See Gregg,* 428 U.S. at 193–95, 193 n. 44, 96 S.Ct. at 2934–35, 2935 n. 44.

To be upheld as constitutional, Colorado's death penalty statute must survive scrutiny under the eighth and fourteenth amendments of the United States Constitution and under article II, sections 20 and 25 of the Colorado Constitution.[3] The statute must also be constitutional both on its face, and as applied to this particular defendant.

### A.

A death penalty statute must be facially constitutional under the eighth amendment

---

**3.** State courts are free to consider the merits of a constitutional challenge to the state constitution, independent of United States Supreme Court opinions. *Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005 (Colo.1982). This is true even when the state constitution is similarly or identically phrased to the federal constitution. *Id.* at 1016 n. 11. On occasion, we have rejected the Supreme Court's interpretation of the federal constitution. *See People v. Sporleder,* 666 P.2d 135, 140–42 (Colo.1983) (Colorado Constitution recognizes legitimate expectation of privacy in the telephone numbers dialed on a person's home telephone); *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980) (taxpayer under the Colorado Constitution has a reasonable expectation of privacy in bank records of his financial transactions). The court has expanded constitutional protections primarily regarding search and seizure issues. These cases do not seem to suggest that the constitution of this state would be construed in a different fashion as regards capital sentencing.

cruel and unusual punishment clause, and under the fourteenth amendment due process clause. Rosen at 946. In *Gregg v. Georgia,* 428 U.S. at 188, 96 S.Ct. at 2932 (1976), the United States Supreme Court specifically addressed the question of "whether the sentence of death for the crime of murder is a *per se* violation of the Eighth and Fourteenth Amendments to the [United States] Constitution," *id.* at 176, 96 S.Ct. at 2926, and concluded that the death penalty was not unconstitutional *per se.* "[T]he death penalty is not a form of punishment that may never be imposed." *Id.* at 187, 96 S.Ct. at 2932. Nevertheless, the defendant here asks us to hold that imposition of the death penalty under any circumstances is cruel and unusual punishment in violation of article II, section 20 of the Colorado Constitution.

Since its holding in *Gregg,* the Supreme Court has consistently rejected this argument. *Jurek v. Texas,* 428 U.S. 262, 268, 96 S.Ct. 2950, 2954, 49 L.Ed.2d 929 (1976); *Proffitt,* 428 U.S. at 247, 96 S.Ct. at 2964. No aspect of Colorado's Constitution supports the contention that our death penalty statute is unconstitutional *per se.* Because similar death penalty statutes have not been held facially unconstitutional by the Supreme Court, I would likewise reject the defendant's argument here.

### B.

Although not invalid *per se,* the more problematic question is whether the death penalty has been imposed in an unconstitutionally arbitrary or capricious manner. *Gregg,* 428 U.S. at 195, 96 S.Ct. at 2935. An arbitrary or capricious result can be avoided only by the use of "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Id.* Each sentencing scheme must be examined on an individual basis. *Id.*

In *People v. District Court,* 196 Colo. 401, 586 P.2d 31 (1978) (hereinafter *District Court II* ), this court struck down as unconstitutional Colorado's death penalty statute, section 16–11–103, 8 C.R.S. (1973) (1976 Supp.), because it did not meet the constitutional requirements of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (evidence at sentencing phase cannot be limited to only statutory mitigating circumstances). The ruling in *District Court II* turned on the statute's limitation of the evidence which a defendant could present to establish mitigation in the sentencing phase. In response to *District Court II,* the legislature amended the death penalty statute, effective August 7, 1979.[4] 1979 Colo.Sess.Laws 674, § 1. "[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct." *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed. 2d 859 (footnote omitted). The question which the parties and amici curiae urge us to address is whether our death penalty statute, as reenacted,[5] is constitutional under the Colorado and United States Constitutions.

---

4. In declining to hold the death penalty unconstitutional in *Gregg,* the United States Supreme Court noted: "The most marked indication of society's endorsement of the death penalty [was] the legislative response to *Furman* ". 428 U.S. at 179, 96 S.Ct. at 2928. In the four years following *Furman,* "at least 35 states had reenacted the death penalty." *Id.*

5. (6) For purposes of this section, aggravating factors shall be the following factors:
 (a) The class 1 felony was committed by a person under sentence of imprisonment for a class 1, 2, or 3 felony as defined by Colorado law or United States law, or for a crime committed against another state or the United States which would constitute a class 1, 2, or 3 felony as defined by Colorado law; or

(b) The defendant was previously convicted in this state of a class 1 or 2 felony involving violence as specified in section 16–11–309, or was previously convicted by another state or the United States of an offense which would constitute a class 1 or 2 felony involving violence as defined by Colorado law in section 16–11–309; or
 (c) The defendant intentionally killed any of the following persons while such person was engaged in the course of the performance of his official duties, and the defendant knew or reasonably should have known that such victim was such a person engaged in the performance of his official duties, or the victim was intentionally killed in retaliation for the performance of his official duties:

"[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity." *Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976). Despite this presumption of validity, the death penalty cannot be constitutionally imposed if the statutory sentencing procedures create a substantial risk that capital punishment may be imposed in an arbitrary and capricious manner. *Id.* at 188, 96 S.Ct. at 2932.

In the cases decided after *Gregg,* the Supreme Court "has imposed a number of requirements on the capital sentencing process to ensure that capital sentencing decisions rest on the individualized inquiry contemplated in *Gregg." McCleskey v. Kemp,* — U.S. ——, 107 S.Ct. 1756, 1772, 95 L.Ed.2d 262 (1987). The first of these requirements arose from *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). *Woodson* invalidated a mandatory sentencing scheme as violative

of the eighth amendment; to satisfy the prohibition against cruel and unusual punishment, the sentencer must consider "the character and record of the individual offender and the circumstances of the particular offense." *Id.* at 304, 96 S.Ct. at 2991. The second requirement arose from the Court's holding in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The sentencer cannot "be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers" in mitigation. *Id.* at 604, 98 S.Ct. at 2964 (emphasis in original). The third requirement involves a two-part analysis: after testing capital sentencing procedures for facial validity, the court must "probe[ ] the application of statutes to particular cases" to determine whether the provisions have been unconstitutionally applied by not adequately guiding the sentencer's discretion. *McCleskey,* — U.S. at ——, 107 S.Ct. at

(I) A peace officer or former peace officer as defined in section 18–1–901(3)(1), C.R.S.; or

(II) A firefighter as defined in section 24–33.5–1202(2), C.R.S.; or

(III) A judge, referee, or former judge or referee of any court of record in the state or federal system or in any other state court system or a judge or former judge in any municipal court in this state or in any other state. For purposes of this subparagraph (III), the term "referee" shall include a hearing officer or any other officer who exercises judicial functions.

(IV) An elected state, county, or municipal official; or

(V) A federal law enforcement officer or agent or former federal law enforcement officer or agent; or

(d) The defendant intentionally killed a person kidnapped or being held as a hostage by him or by anyone associated with him; or

(e) The defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; or

(f) The defendant committed the offense while lying in wait, from ambush, or by use of an explosive or incendiary device. As used in this paragraph (f), "explosive or incendiary device" means:

(I) Dynamite and all other forms of high explosives; or

(II) Any explosive bomb, grenade, missile, or similar device; or

(III) Any incendiary bomb or grenade, fire bomb, or similar device, including any device which consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and can be carried or thrown by one individual acting alone.

(g) The defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants; or

(h) The class 1 felony was committed for pecuniary gain; or

(i) In the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense; or

(j) The defendant committed the offense in an especially heinous, cruel, or depraved manner; or

(k) The class 1 felony was committed for the purpose of avoiding or preventing a lawful arrest or prosecution or effecting an escape from custody. This factor shall include the intentional killing of a witness to a criminal offense.

§ 16–11–103(6), 8A C.R.S. (1986).

1773. Fourth, the Court has "established substantive limitations" on application of the death penalty "where the objective indicia of community values have demonstrated a consensus that the death penalty is disproportionate as applied to a certain class of cases." *Id.* (citing *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (state cannot constitutionally sentence an individual to death as punishment for rape of an adult woman)). *See also Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (eighth amendment prohibits the state from imposing the death penalty on an insane prisoner. *Id.* at 2602).

Constitutional deficiencies in a capital sentencing scheme "will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg*, 428 U.S. at 192, 96 S.Ct. at 2934. The dispositive issue is whether the sentencer's discretion is adequately limited and guided by the statute.

We held in *District Court II* that "[a] statute must meet at least two requirements before it can serve as the basis for imposition of the death sentence." 196 Colo. at 405, 586 P.2d at 34. First, the statute must provide a " 'meaningful basis for distinguishing the ... cases in which it is imposed from [those] in which it is not.' " *Id.* (citing *Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346). To satisfy this requirement, "the legislature may enumerate specific aggravating factors, the presence of which will serve to justify the imposition of a sentence of death." 196 Colo. at 405, 586 P.2d at 34. Second, the legislation must allow the defendant "to present any relevant information as to why the death sentence should not be imposed upon him." *Id.*

The United States Supreme Court analyzed Florida's death penalty statute in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and found that the statute satisfied the *Furman* requirements. Florida's statute differs from the Georgia and Colorado statutes in the respect that the jury under Florida's statute renders an advisory verdict, and the actual sentence is determined by the trial judge after the judge weighs eight aggravating factors against seven mitigating factors. *Proffitt*, 428 U.S. at 251–52, 96 S.Ct. at 2966. Regardless of whether the "actual" decision is made by the judge or the jury, the determination of whether there has been an arbitrary and capricious application of the death penalty is the same for purposes of analysis. The Court concluded:

> Under Florida's capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed [on automatic appeal] to ensure that they are consistent with other sentences imposed in similar circumstances.

428 U.S. at 253, 96 S.Ct. at 2967.

The constitutionality of application of Colorado's capital sentencing statute to a particular defendant depends on whether the "aggravating circumstances are clear, understandable, precise, and easily applied by the sentencer and reviewed by the appellate courts." *Rosen* at 942–43. "The thrust of [the Supreme Court's] decisions on capital punishment has been that ' "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." ' " *Barclay v. Florida*, 463 U.S. 939, 950, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134 (1983). This arbitrary and capricious standard "demands that [an aggravating] factor be capable of *objective* determination." *Cartwright*, 822 F.2d at 1485 (emphasis added). An aggravating factor cannot be constitutionally applied if it is "defined and applied so broadly that it conceivably could cover every first degree murder." *Id.* at 1485.

Colorado's statute requires the jury to consider the defendant's character and record, and the circumstances of the partic-

ular offense. § 16–11–103(5)(a–c, f, j); *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991. The defendant is permitted to present any type of evidence, including any aspect of his character and any circumstances of the offenses, in mitigation. § 16–11–103(5)(*l*); *Lockett,* 438 U.S. at 608, 98 S.Ct. at 2966. Third, application of section 16–11–103 to this particular defendant did not result in a showing of inadequate guidance for the sentencing jury. *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Finally, this statute does not violate the requirement that the penalty be proportionate to the crime. § 16–11–103(1)(a) (statute limited to defendants convicted of a class 1 felony). *See Coker v. Georgia,* 433 U.S. at 592, 97 S.Ct. at 2866; *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335.

As seen in *Proffitt,* another important factor considered by the United States Supreme Court in review of capital sentencing statutes is the provision for automatic review by the state supreme court. *See Gregg,* 428 U.S. at 203, 96 S.Ct. at 2939; *Proffitt,* 428 U.S. at 253, 96 S.Ct. at 2967; *see also Hopkinson v. State,* 632 P.2d 79, 156 (Wyo.1981). Colorado's statute also provides for automatic review by the Colorado Supreme Court. § 16–11–103(7)(a, b), 8A C.R.S. (1986).[6]

Colorado's aggravating factor provisions, section 16–11–103(6)(a-k), are similar to those adopted in other states. All but one are strictly objective determinations which are easily identified. The only aggravating factor that has been considered "constitutionally suspect" in other jurisdictions, under certain circumstances, is subsection (6)(j), which describes an aggravating factor as follows: "The defendant commit-

ted the offense in an especially heinous, cruel, or depraved manner; ..." Rosen at 945. This provision has generally been held to be facially constitutional. *Gregg,* 428 U.S. at 201, 96 S.Ct. at 2938 (Georgia's "outrageously or wantonly vile, horrible or inhuman" aggravating factor not unconstitutional as applied by the Georgia Supreme Court); *Proffitt,* 428 U.S. at 255, 96 S.Ct. at 2968 (Florida's "especially heinous, atrocious, or cruel" aggravating factor is not inadequate guidance, as construed by Florida Supreme Court). This same phrase: "especially heinous, atrocious or cruel," was also upheld by the Wyoming Supreme Court as constitutional under the Wyoming and United States Constitutions. *Hopkinson v. State,* 632 P.2d 79, 153 (Wyo.1981). ("The statute does *not* fail to properly channel the jury's sentencing discretion and does *not* grant it unfettered discretion to impose the death penalty for arbitrary and capricious reasons." *Id.* (emphasis in original). Under limited circumstances, however, the death penalty has been vacated when this provision was applied in an unconstitutional manner. *See Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987).

The question of whether this provision is constitutionally deficient need not be decided here because the jury found that three separate aggravating factors were present. The jury found that the defendant had been a party to an agreement to kill, and that the defendant knowingly created a grave risk of death to another person. § 16–11–103(6)(e, i), 8A C.R.S. (1986).

In *Zant v. Stephens,* the United States Supreme Court addressed the "significance of the invalidation of one of multiple aggravating circumstances considered by the jury in a capital case." 462 U.S. 862, 870,

---

**6.** (7)(a) Whenever a sentence of death is imposed upon a person pursuant to the provisions of this section, the supreme court shall review the propriety of that sentence, having regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based. The procedures to be employed in the review shall be as provided by supreme court rule.

(b) A sentence of death shall not be imposed pursuant to this section if the supreme court determines that the sentence was imposed under the influence of passion or prejudice or any other arbitrary factor or that the evidence presented does not support the finding of statutory aggravating circumstances. § 16–11–103(7), 8A C.R.S. (1986).

103 S.Ct. 2733, 2739, 77 L.Ed.2d 235 (1983). The capital sentencing jury found three aggravating factors, one of which was later held unconstitutional. After noting that "different state appellate courts have reached varying conclusions," the Court held that where the sentencer has engaged in an individualized determination of aggravating factors, as required by Georgia statute, then the remaining aggravating factors serve to "adequately differentiate" the particular case. *Id.* at 879, 103 S.Ct. at 2744. On this basis, the death sentence was upheld on the remaining two aggravating factors. The Court stated that "a death sentence supported by at least one valid aggravating circumstance need not be set aside ... simply because another aggravating circumstance is 'invalid' in the sense that it is insufficient by itself to support the death penalty." *Id.* at 884, 103 S.Ct. at 2746. As a result, either of the two remaining aggravating factors is sufficient to support the jury's verdict in the penalty phase.

Based on rulings by the United States Supreme Court, I believe our death penalty is constitutional on its face and constitutional as applied to Richard Drake. I would affirm the jury's verdicts in both phases of the proceedings. Accordingly, I respectfully dissent.